# OLD DOMINION LAND COMPANY *v.* UNITED STATES.

ERROR TO THE CIRCUIT COURT OF APPEALS FOR THE FOURTH CIRCUIT.

No. 55.   Argued October 16, 1925.—Decided November 16, 1925.

1. The general purpose of a statute to authorize acquisition of property only to carry out existing agreements of the Government, will not control a specific provision therein for the acquisition of property specifically mentioned, as to which there was no agreement. Act of March 8, 1922, c. 100, § 1, 42 Stat. 418.   P. 63.

2. The United States erected costly buildings on land which it leased during the war, and, after expiration of the term, began proceedings to condemn the land on the last day of a period allowed by the lease for removing improvements. *Held* that the buildings were the property of the United States and not to be considered in fixing the land owners' compensation.   P. 65.

3. Therefore, the Act of March 8, 1922, *supra,* in excluding compensation for such improvements on the land in question, is not unconstitutional.   *Id.*

4. Whether the purpose of saving the loss of buildings erected on leased land by the Government may be a public purpose justifying condemnation of the land, is not here decided.   P. 66.

5. Although the purpose moving the Secretary of War to request condemnation proceedings may not be a public one, yet, if the authorizing Act import an implied declaration of purpose by Congress to acquire the land for military uses, which are public, this must be accepted, if not shown to involve an impossibility. P. 66.

6. * Jurisdiction over a condemnation suit brought at the request of the Secretary of War under the Act of August 1, 1888, is not dependent upon the precise shade of opinion, expressed by him in his letter of request to the Attorney General, concerning the necessity or advantage to the Government of procuring the land in question. P. 66.

296 Fed. 20, affirmed.

ERROR to a judgment of the Circuit Court of Appeals which affirmed a judgment of the District Court condemning land in a proceeding brought by the United States.

*Messrs. J. Winston Read* and *Thomas H. Willcox,* with whom *Mr. R. G. Bickford* was on the brief, for the plaintiff in error.

It was essential for the petition to show that, in the opinion of the Secretary of War, it was necessary or advantageous to the United States that the lands mentioned in the petition should be acquired by condemnation by the United States. Act of August 1, 1888. The Government filed with its amended petition the letter of the Secretary of War. This not only shows a failure to comply with the Act, but also shows that the lands sought to be condemned were not sought or needed by the United States for public use, but simply for the public benefit to protect the Government's interest in certain expenditures made, or improvements placed on said lands. The Secretary's certificate may properly be silent as to the purpose of the taking, but if it indicates that that purpose is not for the " public use ", the certificate does not comply with the statutory requirement.

There was no statutory authority for the taking. The Acts of March 8, and July 1, 1922, show on their face that

---

* The Secretary's letter requesting the institution of condemnation proceedings reviewed the Government's relation to the land, referred to the value of the improvements, and expressed his opinion that " To protect the Government's interests it is necessary and highly advantageous to acquire title to the lands upon which these improvements are situated."

the fundamental purpose was to purchase only what the United States had previously obligated itself to purchase. The Act of July 1, 1922, in nowise enlarges the scope of the Act of March 8, 1922, and gives no additional authority. It simply makes appropriation for the purchases, etc., provided for in the Act of March 8, 1922. The Act of July 11, 1919, indicated that the general policy of Congress was to stop war expenditures. The Act of March 8, 1922, proposed to purchase war properties. This was, without explanation, a violation of the policy of the Act of July 1, 1919, above referred to, and the language of the opening clauses of the later act was inserted to show that it did not create an exception to that policy, but was merely a recognition by the Government of obligations in certain cases in the event they existed prior to the Act of July, 1919.

The circumstances under which the Act was enacted, and the representations made as an inducement to its passage, clearly indicate that it was not the intention of the Act to authorize purchases of land which the United States held on lease for an agreed term and in respect to which it owed the duty that every tenant owes to his landlord. It is true that the Quartermaster Warehouses at Newport News are specifically mentioned in the Act of March 8, 1922, but they are mentioned after the scope of the Act has been specifically declared and their mention is preceded by the language: "For the purpose of carrying out the provisions of this section, the following amounts are hereby authorized to be appropriated." The language immediately preceding the language above quoted shows that the Act is only intended to operate as to real estate " in respect whereof " the United States has become obligated.

The Act of March 8, 1922, is in violation of the Fifth Amendment. The value of land should be fixed as of the date of the proceedings. The location and surround-

ings must be considered in estimating value. On several occasions Congress has attempted to exclude items of value from awards to be made in condemnation proceedings. So far as our research extends, the courts have invariably declared them unconstitutional. *Monongahela Nav. Co.* v. *United States,* 148 U. S. 312; *In re Montgomery,* 48 Fed. 901; *In re Manderson,* 51 Fed. 501. See also *Hanson Lumber Co.* v. *United States,* 261 U. S. 581.

Reports of the House and Senate Committees, and statements of the committee members in charge of the bills are admissible to show the legislative intent.

The lands are taken, not for the public use, but simply for the public benefit. " Public use " and " public benefit " are not synonymous. Lewis on Em. Dom. § 165; *Richmond* v. *Carneal,* 129 Va. 388; *Salisbury Land & Imp. Co.* v. *Massachusetts,* 215 Mass. 371; *Madisonville Traction Co.* v. *Saint Bernard Mining Co.,* 196 U. S. 239; *In Re Opinion of Justices,* 204 Mass. 607; *Bloodgood* v. *Mohawk,* 18 Wend. (N. Y.), 9; *Strickley* v. *Highland Boy Co.,* 200 U. S. 527; *Hairston* v. *Danville & Western Ry.,* 208 U. S. 598; *Brown* v. *United States,* 263 U. S. 78, distinguished.

The United States, in this proceeding, is endeavoring to save money for the Government by an outside land speculation. The incidental saving in money to the United States arising from this condemnation proceeding does not constitute such public use as is contemplated by the constitutional provision.

But it is said that the use in the Act of the words " for the quartermaster warehouses at Newport News," is an expressed declaration that the property is to be taken for the plainly public use of quartermaster warehouses. Such language is merely descriptive of the property as it existed at the time of the passage of the Act. The Act

must be read in connection with the facts that existed at the time. Long before, these properties were known as " Quartermaster Warehouses." The Secretary's letter to the Attorney General authorizing these proceedings speaks of the " Quartermaster's Warehouses " as structures which had long been in existence, which structures he had previously stated to the Military Committees were no longer necessary for the public use. This recommendation, showing that the purpose of the act was to acquire the site for the quartermaster warehouses then in existence, was transmitted to Congress by the Chairman of the Committee of Military Affairs of the House and of the Senate.

There is nothing in either Act to show that the future use of the property would be for quartermaster warehouses. It is true that the caption of the section of the Act of July, 1922, making appropriations for the purchase of the warehouse lands is " Sites for military purposes," but this Act neither authorizes, nor attempts to authorize anything more than is authorized in the Act of March 8, 1922. It is merely a conventional designation. The fact that the words " for the Quartermaster warehouses, etc.," were merely used to identify this particular property, and not to indicate the future use to which said property was to be devoted, is abundantly supported by the record.

All that this Court can say after reading the statutes relied on by the Government and reading the petition of the Government is that the property may have been intended for a public use or may not have been. If it gives any effect at all to the reports of the two chairmen of the Committees it will be compelled to hold that the property was not required for a public use. If the Court gives any effect to the granting of a lease by the Secretary of War, it becomes entirely clear that no then present public use existed for the taking of the land, since that

lease could not be given except under the provisions of the Act of July 28, 1892, which authorized such leases only during the period when there was no public use. That lease by its terms begins on the first day of August, 1922, one day after the institution of these proceedings. The Government is authorized to sell or lease this property, if acquired. Army Appropriation Act, 41 Stat. 129, 130.

The facts proven upon trial should have been considered by the court in determining whether the property of the plaintiff in error was taken for a public use. It is the sole province of the courts to determine whether a use is a public use. *United States* v. *New River Collieries,* 262 U. S. 341; *Monongahela* v. *United States,* 148 U. S. 312; *Sears* v. *Akron,* 246 U. S. 242; *Rindge* v. *Los Angeles,* 262 U. S. 700. In this view of the case, it is not a question whether the court can deny the truth or good faith of the expressed declaration in the statute, as suggested in the opinion of the Circuit Court of Appeals. When the language of the statute is considered in the light of the facts proved in the case, and the congressional history of the Act is likewise taken into consideration, it is clear that the words " for the Quartermaster warehouses," which otherwise might have been construed to designate the use to which this property was to be put by the Government, are simply used to point out the particular property to be taken. The statute would then be silent on the question of future use; and under all of the authorities evidence would be admissible to show that the purpose of the Government was to sell or lease the improvements it had placed upon the land. If Congress, by a mere *ipse dixit,* can determine the question of public use, and take away from the courts the power in that regard, what protection is the constitutional provision to the citizen? 20 C. J. 549; *Block* v. *Hirsch,* 256 U. S. 135; *Alfred Phosphate Co.* v. *Duck River Phosphate Co.,* 120 Tenn. 260; *Varner* v. *Martin,* 21 W. Va. 534.

Plaintiff in error is entitled to compensation for the value of the buildings erected on the leased premises and not removed within the time provided in the lease.

The facts of this case do not bring it within *Nor. & O. Ry. Co.* v. *Turnpike Co.*, 111 Va. 131; *New River Etc., Co.* v. *Honaker*, 119 Va. 641; *Bear Gulch Placer Mining Co.* v. *Walsh*, 198 Fed. 351; *Searl* v. *Lake County*, 133 U. S. 553; *Consol. Turnpike Co.* v. *Norfolk, etc., Ry. Co.*, 228 U. S. 596. On the contrary, when the leases in controversy were made the United States had no idea of taking them in condemnation proceedings, but took the precaution to execute a written contract with the owner, whereby the right of removal was given it within a certain limited time. Under these circumstances, there being no intention to take this property by purchase or condemnation when the improvements were erected, and the facts simply showing a case of neglect to remove the improvements within the time limited in the contract of lease, the improvements now belong to the owner. Buildings not removed during the term, or time limited by lease, become the absolute property of the lessor, 2 Minor's Inst., 613; 25 C. J. 706; 11 R. C. L. 1072; *Freeman* v. *Dawson*, 110 U. S. 264; *Kinkead* v. *United States*, 150 U. S. 483; *United States* v. *Bostwick*, 94 U. S. 65; *Clifford* v. *United States*, 34 Ct. Cls. 232; 32 Op. Atty. Gen. 114; 26 C. J. 705; Wood on Landlord and Tenant, 529; *Morey* v. *Hoyt*, 62 Conn. 542; *Ray* v. *Young*, 160 Iowa 613; *Tunis Lumber Co.* v. *Dennis Lumber Co.*, 97 Va. 682; *Highes* v. *Kershaw*, (Colo.), 51 L. R. A. (N. S.), 723. The right of possession of the plaintiff in error was complete except as to such possession of the United States as was necessary to enable it to remove the warehouses.

The filing of the condemnation proceedings could not extend the time of the United States for the removal of the buildings.

*Mr. Blackburn Esterline,* Assistant to the Solicitor General, with whom *Solicitor General Beck* was on the brief, for the United States.

The statutes authorized and directed the Secretary of War to acquire the land by condemnation if necessary. § 3, Act March 8, 1922, 42 Stat. 418; *United States* v. *Chase,* 135 U. S. 255; *Townsend* v. *Little,* 109 U. S. 504; *In re Rouse, Hazard & Co.,* 91 Fed. 96; *Old Dominion Land Co.* v. *United States,* 296 Fed. 21.

The land was condemned for public use. *District of Columbia* v. *Washington Market Co.,* 108 U. S. 243; *United States* v. *Trans-Missouri Freight Ass'n.,* 166 U. S. 290; *Maxwell* v. *Dow,* 176 U. S. 581; *United States* v. *Des Moines Navigation Co.,* 142 U. S. 510; *Soon Hing* v. *Crowley,* 113 U. S. 703; *Old Dominion Land Co.* v. *United States, supra; Shoemaker* v. *United States,* 147 U. S. 282; *Strickley* v. *Highland Boy Mining Co.,* 200 U. S. 527; *Sears* v. *City of Akron,* 246 U. S. 242; *Rindge Co.* v. *City of Los Angeles,* 262 U. S. 700; *Brown* v. *United States,* 263 U. S. 78; *Hairston* v. *Danville & Western Ry.,* 208 U. S. 598; *United States* v. *Forbes,* 259 Fed. 585; *In re Military Training Camp,* 260 Fed. 986; *United States* v. *Gettysburg Electric Ry.,* 160 U. S. 668; Cooley's Const. Limit'ns. pp. 766, 777; Lewis, Eminent Domain, §§ 259, 369.

The Act of March 8, 1922, which excludes the right of the land company to recover compensation on account of addition to the value of the land resulting from the improvements made by or at the expense of the Government, is a valid exercise of congressional power. *United States* v. *New River Collieries,* 262 U. S. 341; *Consolidated Turnpike* v. *Norfolk & Ocean View Ry. Co.,* 228 U. S. 596; *United States* v. *Chandler-Dunbar Co.,* 229 U. S. 53; *Old Dominion Land Co.* v. *United States, supra; Pearson* v. *United States,* 267 U. S. 423.

MR. JUSTICE HOLMES delivered the opinion of the Court.

This is a proceeding for the condemnation of land in Newport News, Virginia, for the use of the United States. Act of August 1, 1888, c. 728; 25 Stat. 357. It has resulted in a condemnation fixing the sum to be paid, subject to questions of law reserved by the plaintiff in error, the Old Dominion Land Company, at the trial and decided by the Circuit Court of Appeals. 296 Fed. Rep. 20.—During the late war the Government took leases of the land from the Old Dominion Land Company for military purposes and put structures upon it costing more than a million and a half dollars. The leases were for short terms and were renewed, until in 1922 the lessor refused to renew them again. By the terms of the agreements the United States had a right to remove the structures but not beyond thirty days from the termination. An offer to purchase the land was made by the United States but was refused, and this proceeding was instituted on July 29, 1922, just before the thirty days allowed by the leases had run out. The main contentions of the plaintiff in error are that the Acts of Congress relied upon do not authorize the taking attempted here; that one of those Acts is unconstitutional, and that the taking, although it might be for the benefit of the United States, to save its buildings, was not a taking for public use. We are of opinion that these contentions, so far as material to the case, cannot be sustained and that the decision below was right.

The statute authorizes this proceeding. The Appropriation Act of July 11, 1919, c. 8, 41 Stat. 104, 128, and its Amendments of the same year, c. 44; *ibid.* 278, and c. 90; *ibid.* 453, had stopped the purchase of land in connection with military purposes generally, except in certain cases when it was more economical to buy than to pay rent or damages. This Act was further amended how-

ever by the Act of March 8, 1922, c. 100, § 1; 42 Stat. 418, so as to " authorize completion of the acquisition of the real estate hereinafter specified in respect whereof requisition notices had been served or given before July 11, 1919, . . . or in respect whereof agreements had been made for purchase thereof, or proceedings begun for condemnation thereof." "For the purpose of carrying out the provisions of this section the following amounts are hereby authorized to be appropriated, to wit: . . . for quartermaster warehouses, Newport News, Virginia, $223,670." This is the land in question. By § 3 of the same Act the Secretary of War was authorized to renew leases in order to enable the Government to remove its buildings and other property, and to approve awards and to have new awards made for the purchase or condemnation of land necessary in his judgment for the operation of water plants now located thereon, &c., provided "that any addition to the value of the premises resulting from the improvements thereto or in the vicinity thereof made by or at the expense of the United States shall be excluded from the sum paid to or recovered by the owners." The later Deficiencies Appropriation Act of July 1, 1922, c. 258, 42 Stat. 767, 777 supplies deficiencies: "Sites for military purposes: For completion of acquisition of real estate as authorized by" the last mentioned Act: "For quartermaster warehouses, Newport News, Virginia, $223,670."

It is argued that the general purpose of this exception to the stopping of expenditures was only to carry out agreements by which the Government already was bound; and that the specific appropriations were made only in case the property mentioned was the object of such previous agreement. No doubt the general purpose was that suggested, but the rest of the Act showed that the appropriation was not confined to that alone, and the specific unqualified mention of the land in question as land of

which the acquisition was to be completed overrides the general statement, however much confirmed by citations from the congressional debates.

Then it is said that the Act of March 8, 1922, was unconstitutional by reason of the proviso that we have stated, excluding from the compensation improvements upon the land or in the vicinity thereof made by the United States. There might be cases in which this provision could not be sustained, but there is no trouble here. For supposing that the proviso were extended beyond the taking in aid of a water plant to which it immediately referred, it could have no bearing except upon the issue agreed to by counsel, "whether the value of the warehouses constructed by the United States Government on the lands sought to be condemned should be included in the valuation of said lands." But upon this issue the statute was superfluous. When these proceedings were begun the buildings belonged to the United States. It would not be just to allow the delay necessary in legal proceedings to deprive the United States of rights that it had and endeavored by this suit to assert. *Consolidated Turnpike Co.* v. *Norfolk & Ocean View Ry. Co.,* 228 U. S. 596, 602. In the often quoted language of Chief Justice Shaw: "If a pie-powder court could be called on the instant and on the spot, the true rule of justice for the public would be, to pay the compensation with one hand. while they apply the axe with the other." *Parks* v. *Boston,* 15 Pick. 198, 208. It in no way appeared that the value of the land was increased by other improvements in the vicinity, or otherwise than by the structures upon the land so that the most indefensible aspects of the statute are not before us here. Furthermore the instructions to the jury were that they were to determine the fair market value of the land as well for its present purposes as for those for which it might be reasonably

adapted at the time or in the immediate future, and to take into consideration the facts and circumstances of its location, &c., with no language that excluded consideration of improvements in the vicinity, if any there were.

But it is said that the taking was not for a public use, because it is said that the Secretary of War at least was thinking not of a future use of the land by the public or the Government but of saving the country from the loss of the buildings. We shall not inquire whether this purpose was or was not so reasonably incidental to the necessarily hurried transactions during the war as to warrant the taking, upon the principle illustrated by *Brown* v. *United States*, 263 U. S. 78. Congress has declared the purpose to be a public use, by implication if not by express words. If we disregard the heading quoted from the latest Act, 'Sites for military purposes', which we see no reason for doing, and treat 'For quartermaster warehouses' as descriptive rather than prospective, still there is nothing shown in the intentions or transactions of subordinates that is sufficient to overcome the declaration by Congress of what it had in mind. Its decision is entitled to deference until it is shown to involve an impossibility. But the military purposes mentioned at least may have been entertained and they clearly were for a public use.

Some question is made as to whether a letter from the Secretary of War to the Attorney General sufficiently authorized the present proceedings by showing that in his opinion it was necessary or advantageous to the Government to take them. The Act of August 1, 1888, c. 728; 25 Stat. 359, allows the Secretary to acquire by condemnation lands which he is authorized to procure for public purposes, 'whenever in his opinion it is necessary or advantageous to the Government to do so'; gives jurisdiction to the courts of the United States, and makes it the duty of the Attorney General upon every application of such officer to cause proceedings to be commenced. We

perceive no requirement that the Secretary should go further than to apply to the Attorney General. Moreover, the Secretary's letter certainly showed that he thought the suit would be advantageous to the Government, and we should be slow to suppose that the precise shade of his opinion upon the point affected the jurisdiction of the Court.

*Judgment affirmed.*