# UNITED STATES ᴇx ʀᴇʟ. TENNESSEE VALLEY AUTHORITY *v.* WELCH.

NO. 528.

Argued March 7, 1946.—Decided March 25, 1946.

*Joseph C. Swidler* argued the cause for petitioner. With him on the brief were *Solicitor General McGrath* and *Charles J. McCarthy.*

*McKinley Edwards* argued the cause and filed a brief for respondent in No. 528.

*George H. Ward* argued the cause for respondents in Nos. 529 to 533, inclusive. With him on the brief was *G. L. Jones.*

548

MR. JUSTICE BLACK delivered the opinion of the Court.

The United States, on behalf of the Tennessee Valley Authority, filed petitions in the District Court to condemn six tracts of land located in North Carolina and owned by the several respondents. It asserted that the power to condemn the land in question was conferred upon the Authority by the provisions of the Tennessee Valley Authority Act as amended. 48 Stat. 58 as amended, 16 U. S. C. 831–831dd. The District Court held that the Act did not authorize condemnations under the facts shown by the evidence and dismissed the petitions. The Circuit Court of Appeals affirmed. 150 F. 2d 613. Since the grant of power to condemn needed properties is an essential part of the Act, we granted certiorari.

The following basic facts form the background of this proceeding: Congress in 1942, in order to meet pressing power needs for war production, empowered the Authority to construct Fontana Dam, on the Little Tennessee River in North Carolina. H. Rep. 1470, 77th Cong., 1st Sess., 25. The dam is one of the world's largest and creates a reservoir twenty-nine miles long. Between this reservoir and the Great Smoky Mountains National Park lie forty-four thousand acres of mountainous land, including the tracts which the Government wants to condemn here. When Congress authorized construction of the dam, two hundred and sixteen families occupied this area. Their only convenient means of ingress and egress, except for foot trails, was North Carolina Highway No. 288, a road approximately fifty miles in length. When the dam was built the reservoir flooded most of the highway, rendering it useless for travel. As a result the area remained practically isolated.

As events have shown, the problem this situation created could not be easily solved. Any solution had to take into consideration the interests of the United States, of North Carolina, and of Swain County, N. C., as well as the in-

terests of the individuals affected. The United States' interest was that of the T. V. A. and the National Park Service. The T. V. A. had a dual interest. First, the isolated area, while not actually submerged by the reservoir, was a part of the watershed. Left in private hands it could be used to frustrate some of the objectives of T. V. A. legislation. Second, the fact that the dam had caused the highway to be flooded created a serious problem for the inhabitants and landowners in the area who had been damaged by the project. It was the statutory duty of the T. V. A. to attempt to bring about proper adjustments in order to alleviate resulting hardship and inconvenience. At the same time, the T. V. A. was not supposed to waste the money of the United States. The United States' interest in the land through the National Park Service was due to the fact that this particular area had been included in the Great Smoky Mountains Park project. Had this land been actually owned by the United States for park purposes it would have been easier to subject it to servitudes in the interest of the T. V. A. development. North Carolina was interested in the land because it was its duty to continue to hold and maintain a highway so long as its citizens continued to live within the area. Swain County had a similar interest. It had issued bonds to finance building the highway. Part of the bond issue was still outstanding.

Conferences between the interested groups brought to light facts which led to the solution ultimately adopted. It was agreed on all sides that the old road was narrow, dangerous, and far below modern standards for useful highways. Investigation showed that replacement of the old road with the same undesirable type of highway would cost about $1,400,000.00, while the cost of building an improved highway would greatly exceed that amount. All parties felt that the United States had neither a legal nor moral duty to build a new road of the superior type

and quality needed. This meant that type of road could only be built if North Carolina would bear the additional expense. Since the highway carried no through traffic and serviced so few people, the State was not willing to pay for the added cost and all parties agreed that such an expenditure would be wasteful and unjustifiable. The War Production Board presented further obstacles. It was of the opinion that the road was not sufficiently essential to warrant use of the materials and manpower its construction would require. For these and other reasons North Carolina objected to the T. V. A.'s settling the controversy by a mere payment of damages to it for injury to the road and by the payment of damages to individual owners for destroying their access to the area. The State contended that this would leave the area in private hands with no adequate roads to serve the people and would impose unwise, if not impossible burdens, on the State and County in connection with providing schools, police protection, health services, and other necessary facilities.

After a year and a half of negotiations a solution was worked out. After the proposed solution was approved by the Governor, the Council of the State, and the Legislature of North Carolina, it was embodied in a settlement agreement between the State, the County, the National Park Service, and the T. V. A. Under that agreement the T. V. A. with the aid of a $100,000 contribution by the State was to acquire all the land in the isolated area, either by purchase or condemnation, so as to relieve the State from further responsibility for maintaining a highway to that section; Swain County was to be paid $400,000 by the Authority to help retire its outstanding road bonds; and the Authority was to transfer all the area lands to the National Park Service for inclusion within the Great Smoky Mountains National Park but reserving to the T. V. A. all rights required to carry out the T. V. A. program. The agreement, thus, satisfied the interests of the

State, the County, the T. V. A., and the National Park Service. The cost to the United States was several hundred thousand dollars less than the cost of rebuilding the old road. And all the landowners in the area, except these six respondents who refused to sell, have received full compensation for their property.

The courts below have held that T. V. A. had no power under the Act to condemn the tracts of these respondents as contemplated by the agreement. The District Court reached this conclusion by limiting the Authority's power so that it can condemn only those lands which are needed for the dam and reservoir proper. It reasoned that the common law rule of construction requires that statutory powers to condemn be given a restrictive interpretation. But § 31 of the Act expressly provides that the Act shall be "liberally construed to carry out the purposes of Congress to provide . . . for the national defense, improve navigation, control destructive floods and promote interstate commerce and the general welfare." In the face of this declaration, the District Court erred in following the asserted common law rule.

The Circuit Court of Appeals, without expressly relying on a compelling rule of construction that would give the restrictive scope to the T. V. A. Act given it by the District Court, also interpreted the statute narrowly. It first analyzed the facts by segregating the total problem into distinct parts and, thus, came to the conclusion that T. V. A.'s purpose in condemning the land in question was only one to reduce its liability arising from the destruction of the highway. The court held that use of the lands for that purpose is a "private" and not a "public use" or, at best, a "public use" not authorized by the statute. We are unable to agree with the reasoning and conclusion of the Circuit Court of Appeals.

We think that it is the function of Congress to decide what type of taking is for a public use and that the agency

authorized to do the taking may do so to the full extent of its statutory authority. *United States* v. *Gettysburg Electric R. Co.*, 160 U. S. 668, 679. It is true that this Court did say in *Cincinnati* v. *Vester*, 281 U. S. 439, 446, that "It is well established that in considering the application of the Fourteenth Amendment to cases of expropriation of private property, the question what is a public use is a judicial one." But the Court's judgment in that case denied the power to condemn "excess" property on the ground that the state law had not authorized it. And in *Hairston* v. *Danville & Western R. Co.*, 208 U. S. 598, 607, this Court, referring to the "rule" later stated in the *Vester* case, said that "No case is recalled where this court has condemned as a violation of the Fourteenth Amendment a taking upheld by the state court as a taking for public uses in conformity with its laws." And see *Madisonville Traction Co.* v. *Mining Co.*, 196 U. S. 239, 257, 260–261. But whatever may be the scope of the judicial power to determine what is a "public use" in Fourteenth Amendment controversies, this Court has said that when Congress has spoken on this subject "Its decision is entitled to deference until it is shown to involve an impossibility." *Old Dominion Co.* v. *United States*, 269 U. S. 55, 66. Any departure from this judicial restraint would result in courts deciding on what is and is not a governmental function and in their invalidating legislation on the basis of their view on that question at the moment of decision, a practice which has proved impracticable in other fields. See *Case* v. *Bowles*, 327 U. S. 92, 101; *United States* v. *New York*, 326 U. S. 572. We hold that the T. V. A. took the tracts here involved for a public purpose, if, as we think is the case, Congress authorized the Authority to acquire, hold, and use the lands to carry out the purposes of the T. V. A. Act.

In passing upon the authority of the T. V. A. we would do violence to fact were we to break one inseparable trans-

action into separate units. We view the entire transaction as a single integrated effort on the part of T. V. A. to carry on its congressionally authorized functions. Cf. *United States* v. *Commodore Park*, 324 U. S. 386, 392. And we find not only that Congress authorized the Authority's action, but also that the T. V. A. has proceeded in complete accord with the congressional policy embodied in the Act. That Act does far more than authorize the T. V. A. to build isolated dams. The broad responsibilities placed on the Authority relate to navigability, flood control, reforestation, marginal lands, and agricultural and industrial development of the whole Tennessee Valley. The T. V. A. was empowered to make contracts, purchase and sell property deemed necessary or convenient in the transaction of its business, and to build dams, reservoirs, transmission lines, power houses, and other structures. It was particularly admonished to cooperate with other governmental agencies—federal, state, and local—specifically in relation to the problem of "readjustment of the population displaced by the construction of dams, the acquisition of reservoir areas, the protection of watersheds, the acquisition of rights-of-way, and other necessary acquisitions of land, in order to effectuate the purposes of the Act." All of the Authority's actions in these respects were to be directed towards "development of the natural resources of the Tennessee River drainage basin and of such adjoining territory as may be related to or materially affected by the development consequent to this Act . . . all for the general purpose of fostering an orderly and proper physical, economic, and social development of said areas . . ." To discharge its responsibilities the T. V. A. was granted "such powers as may be necessary or appropriate" for their exercise. Section 4 (h) of the Act gives the T. V. A. the very broad power to "exercise the right of eminent domain . . ." Section 4 (i) of the Act empowers the Authority to condemn certain specified

types of property and concludes by referring to "all property that it [the Authority] deems necessary for carrying out the purposes of this Act . . . ." To make clear beyond any doubt the T. V. A.'s broad power, Congress in § 25 authorized the Authority to file proceedings, such as the ones before us, "for the acquisition by condemnation of any lands, easements, or rights of way which, in the opinion of the Corporation, are necessary to carry out the provisions of this Act."

All of these provisions show a clear congressional purpose to grant the Authority all the power needed to acquire lands by purchase or by condemnation which it deems necessary for carrying out the Act's purposes. These proceedings were preceded by a T. V. A. resolution that it did deem these acquisitions necessary for such purposes. Despite Congress' clear expression of its purpose to grant broad condemnation power to T. V. A. we are asked to hold that the Authority's power is less than the powers to condemn granted other governmental agencies, which under 40 U. S. C. 257 have been held to have a power to condemn coextensive with their power to purchase. *Hanson Co.* v. *United States,* 261 U. S. 581, 587. Neither the fact that the Authority wanted to prevent a waste of government funds, nor that it intended to cooperate with the National Park Service detracted from its power to condemn granted by the Act. The cost of public projects is a relevant element in all of them, and the Government, just as anyone else, is not required to proceed oblivious to elements of cost. Cf. *Old Dominion Co.* v. *United States, supra.* And when serious problems are created by its public projects, the Government is not barred from making a common sense adjustment in the interest of all the public. *Brown* v. *United States,* 263 U. S. 78. Where public need requires acquisition of property, that need is not to be denied because of an individual's unwillingness to sell. *Kohl* v. *United States,* 91 U. S. 367, 371. When the need

arises individuals may be required to relinquish ownership of property so long as they are given that just compensation which the Constitution requires. *Strickley* v. *Highland Boy Mining Co.*, 200 U. S. 527, 531. Such compensation can be awarded these respondents by the District Court.

*Reversed.*

MR. JUSTICE JACKSON took no part in the consideration or decision of this case.

MR. JUSTICE REED, concurring.

I agree that the TVA has authority to condemn the tracts of land which the Authority seeks to acquire by these proceedings.

This authority flows from the power of eminent domain granted by §§ 4 and 25 of the Tennessee Valley Authority Act, 48 Stat. 58, as amended. The grant which allows condemnation of all property that the Authority "deems necessary for carrying out the purposes of this Act," is in sufficiently broad terms, it seems to me, to justify these condemnations. When the Authority was faced with the problem of justly compensating the occupants of the forty-four thousand acre area between the Fontana Dam lake and the Great Smoky Mountains National Park, North Carolina and Swain County for the destruction of Highway No. 288, it could within its delegated powers purchase or condemn the lands affected or build a substitute highway whichever appeared cheaper. The United States is not barred from the exercise of good business judgment in its construction work. *Brown* v. *United States*, 263 U. S. 78. See *United States* v. *Meyer*, 113 F. 2d 387; *Old Dominion Land Co.* v. *United States*, 296 F. 20, 269 U. S. 55, 66. Such action is not "outside land speculation." 263 U. S. at 84. It follows that having this power, the Authority could contract, as it did, to reduce its expenditures

by the contract arrangements of July 30, 1943, with Swain County and North Carolina. With the Authority's power to turn over its lands to the National Park, we are not here concerned. Under the contract the public rights in Highway No. 288 were acquired by the Authority and it agreed to acquire the lands here in controversy. The acquisition of the whole area was a factor in these arrangements and the condemnation of these smaller tracts is a part of the transaction.

I do not join in the opinion of the Court because of certain. language, *ante,* pp. 551–554, which implies to me that there is no judicial review of the Authority's determination that acquisition of these isolated pieces of private property is within the purposes of the TVA Act. The Court seems to accept the Authority's argument that a good faith determination by it that property is necessary for the purposes of the Act bars judicial review as to whether the proposed use will be within the statutory limits. This argument of lack of judicial power properly was rejected by the Circuit Court of Appeals although, as explained above, I think that court erroneously held that the TVA Act did not authorize these condemnations. 150 F. 2d 613, 616. It is my opinion that the TVA is a creature of its statute and bound by the terms of that statute, and that its every act may be tested judicially, by any party with standing to do so, to determine whether it moves within the authority granted to it by Congress. *School of Magnetic Healing* v. *McAnnulty,* 187 U. S. 94; *Social Security Board* v. *Nierotko,* 327 U. S. 358, 369.

This taking is for a public purpose but whether it is or is not is a judicial question. Of course, the legislative or administrative determination has great weight but the constitutional doctrine of the Separation of Powers would be unduly restricted if an administrative agency could invoke a so-called political power so as to immunize its action against judicial examination in contests between

the agency and the citizen. The former cases go no further than this. *United States* v. *Gettysburg Electric R. Co.*, 160 U. S. 668, 680; *Rindge Co.* v. *Los Angeles*, 262 U. S. 700, 709; *Old Dominion Land Co.* v. *United States*, 269 U. S. 55, 66; *Cincinnati* v. *Vester*, 281 U. S. 439, 446.

Once it is admitted or judicially determined that a proposed condemnation is for a public purpose and within the statutory authority, a political or judicially non-reviewable question may emerge, to wit, the necessity or expediency of the condemnation of the particular property. These are the cases that led the TVA, erroneously in my view, to assert the action of its Board could "not be set aside by a court." *Adirondack R. Co.* v. *New York*, 176 U. S. 335, 349; *Bragg* v. *Weaver*, 251 U. S. 57, 58; *Joslin Co.* v. *Providence*, 262 U. S. 668, 678; *Rindge Co.* v. *Los Angeles*, 262 U. S. 700, 708.

The CHIEF JUSTICE joins in this opinion.

MR. JUSTICE FRANKFURTER, concurring.

I join in the opinion of the Court for I do not read it as does my brother REED. The Bill of Rights provides that private property shall not "be taken for public use, without just compensation." U. S. Const., Amend. V. This Court has never deviated from the view that under the Constitution a claim that a taking is not "for public use" is open for judicial consideration, ultimately by this Court. It is equally true that in the numerous cases in which the issue was adjudicated, this Court never found that the legislative determination that the use was "public" exceeded Constitutional bounds. But the fact that the nature of the subject matter gives the legislative determination nearly immunity from judicial review does not mean that the power to review is wanting. All the cases cited in the Court's opinion sustaining a taking recognize and accept the power of judicial review. I assume that in citing these cases the Court again recognizes

the doctrine that whether a taking is for a public purpose is not a question beyond judicial competence.