## UNITED STATES v. STATE OF NEW YORK.

### No. 121, Docket 20401.

Circuit Court of Appeals, Second Circuit.

Feb. 19, 1947.

Writ of Certiorari Denied June 2, 1947.

See 67 S.Ct. 1512.

L. HAND, Circuit Judge, dissenting.

Herbert A. Einhorn, Asst. Atty. Gen. of the State of N. Y. (Nathaniel L. Goldstein, Atty. Gen., and Wendell P. Brown, Sol. Gen., of Albany, N. Y., on the brief), for defendant-appellant.

Fred W. Smith, Atty., Dept. of Justice, of Washington, D. C. (David L. Bazelon, Asst. Atty. Gen., and Roger P. Marquis, Atty., Dept. of Justice, of Washington, D. C., and Irving J. Higbee, U. S. Atty., of Syracuse, N. Y., on the brief), for petitioner-appellee.

Marshall McLean, of New York City, for Association for the Protection of the Adirondacks, as amicus curiae.

Before L. HAND, SWAN, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

In this appeal the State of New York attacks the condemnation by the United States for a period beyond the war emergency of certain interests in lands forming part of the State's forest preserve in the Adirondacks. The Secretary of War in 1942 determined that it was necessary to construct a railroad over these and adjoining privately-owned lands to transport strategic materials mined in the area to an existing terminus of the Delaware and Hudson Railroad. Accordingly the United States, acting under the Second War Powers Act of 1942, § 201, 50 U.S.C.A. § 171a, filed a petition for the condemnation of the necessary interest in the lands. In those privately owned, it has sought and secured ownership in fee. But in the lands owned by the State, it asked for, and was granted, only "a temporary easement for railroad purposes," and for the location, operation, and removal of railroad facilities over the described lands, "for the duration of the existing national emergency and for fifteen years after the termination thereof, either by Act of Congress or by Executive Order." The State does not question the propriety of the taking for the period of World War II, but challenges the Government's right to the "temporary easement" for 15 years thereafter. In so doing it points to its obligation, stated in the Constitution of the State, Art. XIV, § 1, to keep its forest preserve forever as "wild forest lands," without power to lease, sell, or exchange them.

Initially we may notice the form in which the question is framed before us. The initial decree was granted upon the petitioner's motion for summary judgment,

and the final judgment some two years later upon denial of the State's motion to reopen. Actually the first decree was entered after a hearing at which evidence was taken. The State's position throughout was disclosed initially in its answer where it conceded the underlying facts and attacked the 15-year provision as an invalid attempt by the United States to liquidate its investment in the railroad line. That this was the Government's purpose the State attempted to show in several ways: by a letter of an official of the Defense Plant Corporation, the Government's agency for operation of the line, so saying in so many words; by the duration for only 30 days after the emergency of the Defense Plant's lease of the line; by an offer, hardly shown to be clear cut, of the premises for disposal as surplus property after the close of hostilities. The District Court held this evidence without effect, on the ground that the discretion of the Secretary of War was not limited or controlled by whatever showing of this character might be made. And on this appeal, petitioner takes the same position, and does not, in so many words, concede that the Secretary's purpose was one mainly or wholly of salvage so far as the period of duration under attack is concerned.

But even as thus framed, the issue remains one purely of law, as the parties in effect concede by each asking for judgment. Without any evidence at all, we could hardly avoid the assumption—for whatever it might be worth in the circumstances—that the period chosen was what the Secretary thought necessary to wind up the operations and remove the facilities without undue loss to the United States and damage to the State's forest preserves. Obviously the facilities were not to be used for carrying on war after the war was over. But the real issue here is the extent of judicial review of the Secretary's decision, upon whatever ground it may have been based.

To come to this issue, we may pass the State's first point quickly. It is urged that, since the statute authorizing the taking is itself of limited life, cf. 50 U.S.C.A. Appendix, § 645, the interest condemned cannot last beyond it; but this is clearly contrary to the intent of the statute authorizing the taking of "any real property, temporary use thereof, or other interest therein," 50 U.S.C.A. § 171a, thus including, as the State concedes, a fee simple. United States v. Kansas City, Kan., 10 Cir., 159 F.2d 125. As to the extent of judicial review, many precedents state flatly that the legislative or administrative determination of the taking required for a public use is not open to judicial inquiry. Shoemaker v. United States, 147 U.S. 282, 298, 13 S.Ct. 361, 37 L.Ed. 170; United States v. Gettysburg Electric R. Co., 160 U.S. 668, 685, 16 S.Ct. 427, 40 L.Ed. 576; United States v. 243.22 Acres of Land in Town of Babylon, Suffolk County, 2 Cir., 129 F.2d 678, 683, certiorari denied Lambert v. United States, 317 U.S. 698, 63 S.Ct. 441, 87 L.Ed. 558; United States v. 6.74 Acres of Land in Dade County, Fla., 5 Cir., 148 F.2d 618, 620.[1] Other cases, while sustaining administrative action, have recognized some power to review abuses of administrative discretion phrased in terms of action in "bad faith" or "capriciously" or "arbitrarily." United States v. Meyer, 7 Cir., 113 F.2d 387, 392, certiorari denied Meyer v. United States, 311 U.S. 706, 61 S.Ct. 174, 85 L.Ed. 459; cf. Barnidge v. United States, 8 Cir., 101 F.2d 295, 299.

In its most recent cases the Supreme Court appears not to have made a clear choice between these two formulae. Mr. Justice Black, speaking for the Supreme Court in United States ex rel. Tennessee Valley Authority v. Welch, 327 U.S. 546, 551, 552, 66 S.Ct. 715, 717, stated, "We think that it is the function of Congress to decide what type of taking is for a public use and that the agency authorized to do the taking may do so to the full extent of

---

[1] See also Rindge Co. v. Los Angeles County, 262 U.S. 700, 709, 43 S.Ct. 689, 67 L.Ed. 1186; Joslin Mfg. Co. v. City of Providence, 262 U.S. 668, 43 S.Ct. 684, 67 L.Ed. 1167; Bragg v. Weaver, 251 U.S. 57, 40 S.Ct. 62, 64 L.Ed. 135; Adirondack R. Co. v. People of State of New York, 176 U.S. 335, 349, 20 S.Ct. 460, 44 L.Ed. 492; City of Oakland v. United States, 9 Cir., 124 F.2d 959, 964, certiorari denied 316 U.S. 679, 62 S.Ct. 1106, 86 L.Ed. 1753; United States v. 3.65 Acres of Land in City of St. Louis, Mo., D.C.E.D.Mo., 53 F.Supp. 319.

its statutory authority." Mr. Justice Black was here speaking of the extent of the physical premises takeń, but his remarks seem equally applicable to the duration of the interest acquired. After this case the Supreme Court was asked to overrule an administrative selection of the site to be condemned for a post office. The Court found it unnecessary to determine what powers it would have had if the officials had "acted in bad faith or so 'capriciously and arbitrarily' that their action was without adequate determining principle or was unreasoned." In the absence of such action by the officials, the Supreme Court merely approved their determination, reversing the Circuit Court of Appeals. United States v. Carmack, 329 U.S. 230, 243, 67 S.Ct. 252, 258.

Whether there is here a real divergence in principle we need not determine, since all the authorities show that the scope of judicial review is decidely limited in àny event. Here we surely cannot construe the Secretary's determination as either arbitrary or capricious or an evidence of bad faith. It is conceded that the construction and operation of the railroad line during the war and its removal within a reasonable period thereafter, is a legitimate public use. Indeed, the concession—which also involves an offer of agreement to a judicial provision fixing the proper period of liquidation after the termination of the emergency—would seem to grant the vital element of the Government's case; we might well question how the single legal act of taking for a stated period can now be held partially valid and partially illegal until it is judicially rewritten.

█ But be that as it may, we must regard appropriate liquidation of an investment for a public purpose as itself such a public aim. It has been held a sufficient reason for condemning an interest in fee in property. Old Dominion Land Co. v. United States, 269 U.S. 55, 46 S.Ct. 39, 70 L.Ed. 162. This principle was reaffirmed in United States ex rel. Tennessee Valley Authority v. Welch, supra, 327 U.S. 546, 554, 66 S.Ct. 715, 719, where it was stated: "The cost of public projects is a relevant element in all of them, and the Government, just as anyone else, is not re-

quired to proceed oblivious to elements of cost." The scrapping of a railroad line after only a few years of operation means almost a total loss of investment. By maintenance of the line for a short period the United States may be able to salvage some of its cost. Important and desirable as is the State's obligation to maintain its forest preserves, the hardship upon it for the few years until its lands may return to their previous state of wildness seems comparatively mild compared to that of denizens of cities and farms compelled on short notice to vacate permanently their homes and businesses for the war needs. But all these considerations are legitimate ones for the Secretary, and not for the courts.

Judgment affirmed.

L. HAND, Circuit judge (dissenting).

As I read my brothers' opinion, it is based upon the premise that, even if there be any judicial review of the propriety of taking property for "public use," the extent of what is taken, and the time for which it is taken, are solely for the executive authorities—in this case for the Secretary of War. I should agree with that statement, and my difference with them has no foundation, unless I am right in thinking that we are concerned here with a second "public use," altogether separate from that for which the property was originally taken. I should agree therefore that Judge Bryant's decision in 1943 was right: it was made, flagrante bello, when the national need was not to be denied, even though it conflicted with the very Constitution of the State. Moreover, the time had not yet arrived to challenge the claim to continued possession for fifteen years after the war was over. Now, however, hostilities have ended, the imperious national needs have ended with them, and the "public use" which is said to justify the continued operation of the railroad is to get the greatest salvage for the Treasury, which no doubt will be by a sale for the full term. I submit that we should not dispose of that issue as though it coalesced with the national interest at stake when the property was originally taken.

482

The discussion of the court in United States v. Carmack,[1] at least strongly implies that United States ex rel. Tennessee Valley Authority v. Welch,[2] did not change the law by removing from all judicial review the "public use" for which the property may be taken. I find it hard to believe that any such radical step was intended; nor do I understand that my brothers think that it was. If so, there is an issue to be determined which arose only when the State moved for the rehearing: i. e., whether, hostilities having ceased, it was an "arbitrary" act to continue possession and operation of the railroad for the purpose of realizing the most salvage. I do not of course mean that it can never be a "public use" to save money for the United States;[3] but in deciding whether a taking has been "arbitrary" more is always involved, I apprehend, than whether the United States has any interest whatever to be subserved. As in the case of substantially every right, the result depends upon a compromise between two conflicting interests; what we mean is that the disparity between the contrasted values must not be shockingly against the proposed action. That does demand an appraisal of the two interests; but in thousands of cases that is just what courts must do, though often they seek to veil it. This is not the ordinary case; we have not to deal with a conflict between the Treasury and the pecuniary interests of an individual or a number of individuals, but between the Treasury and the settled wishes of a State of thirteen million people which for many years has declared in the most formal way possible that its forests shall be inviolate. I should not indeed decide either way upon this record; but it does seem to me that the evidence should be developed at a trial, at which the court can learn what is at stake. We are disposing of it summarily, and, although summary disposition has of course its place, it is most important that we should keep it in that place.[4] I can think of few instances to which I should less willingly extend it than this.

---

1 329 U.S. 230, 67 S.Ct. 252.
2 327 U.S. 546, 66 S.Ct. 715.
3 Old Dominion Co. v. United States, 269 U.S. 55, 46 S.Ct. 39, 70 L.Ed. 162.

---

4 Doehler Metal Furniture Co. v. United States, 2 Cir., 149 F.2d 130, 135; Arnstein v. Porter, 2 Cir., 154 F.2d 464, 468.