**UNITED STATES v. CERTAIN PARCELS OF LAND IN WARREN COUNTY.**

### In re MILLAR'S ESTATE.

Civ. No. 355.

United States District Court
W. D. Virginia, Roanoke Division.
Dec. 30, 1949.

Howard C. Gilmer, Jr., United States Attorne, Roanoke, Va., for plaintiff.

George S. Aldhizer, II, Harrisonburg, Va., for defendants.

PAUL, Chief Judge.

The matter before the court is the exception taken by the United States to the report of the commissioners awarding compensation for certain land taken by the Government in a condemnation proceeding. The history of the matter shows a somewhat unusual course of events which occasions the present controversy.

On May 31, 1944, the defendant landowners were the owners of a tract or tracts of land in Warren County adjacent to the town of Front Royal. Prior to this time the owners had started to develop this land or parts of it as a residential subdivision. As early as July, 1941, 'they had, pursuant to the provisions of the state law, Va. Code, § 5217 et seq., placed on record a plat showing the boundaries of the subdivision, the streets and alleys dedicated to public use, etc., and had also recorded an instrument setting forth and establishing the building and other restrictions binding upon purchasers of lots in the subdivision, including such things as the type and cost of houses to be built, location of garages or other outbuildings, and various other restrictions designed, in the opinion of the owners, to make an attractive and desirable residential area. The evidence indicates that on certain portions of the tract a number of houses had been built and lots sold, prior to the outbreak of the war.

On May 31, 1944, the owners of this land entered into an agreement with the United States, acting by the Federal Public Housing Commissioner, whereby the latter leased about 28 acres of this land with such improvements as were thereon for the purpose of "providing or erecting and main-

taining and operating a Project to provide housing or shelter for persons engaged in national defense activities." The lease was for a stated period of one year at an annual rental of $1,100.00, subject to certain rights of renewal, as follows (par. 4 of lease): "4. This Lease shall be automatically renewed from year to year at the same rental and upon the same terms and conditions, unless the Government shall give the Lessor written notice of its intention not to renew at least sixty (60) days prior to the end of the original term of this lease or any renewal thereof; provided that no such renewal shall, without the consent of the Lessor, extend beyond three years after the termination of the existing national emergency."

The lease also contained, among others, the following provisions (pars. 7, 8 and 11) which are pertinent to the present controversy:

"7. The Government shall have the right to make alterations, erect, install and maintain additions and structures and attach fixtures to the Premises and make any and all improvements thereto, including walks, paved service driveways, utilities and roads. All such alterations, additions, structures, fixtures, and improvements except walks, service driveways, underground utilities (and appurtenances), and roads shall be and remain the property of the Government and may be removed from the premises by the Government prior to or within a reasonable time after the expiration of this Lease. It is understood and agreed that upon the termination of this Lease the Government shall not be required to do any restoration work of any nature and may leave the premises in the condition that exists after the removal of such improvements as the Government may elect to take.

"8. The Government may terminate this lease at any time during the original term or any renewal thereof by giving to the Lessor sixty (60) days written notice of such intention to terminate. In the event of such termination, the installment of rent payable for the period during which the termination occurs shall be prorated.

\* \* \* \* \* \*

"11. The Lessor agrees that, in the event the Government shall consider it necessary or advantageous to institute condemnation proceedings for the acquisition of the leasehold interest and other rights conveyed to it by this lease, all of the terms hereof may be incorporated into a stipulation to be filed in the condemnation proceedings, and the annual rental herein reserved shall be the full and just compensation payable by the Government for the taking of said leasehold interest or exclusive use of the premises herein described for the period of one year, together with said other rights herein granted."

After this lease was entered into and was in operation the Government for some reason (possibly a question of title) decided to institute condemnation proceedings to acquire the leasehold interest and other rights conveyed by the lease. This action was taken pursuant to the terms of paragraph 11 of the lease, quoted above. One petition in condemnation, affecting 20.7181 acres of the land, was filed September 25, 1944, and another, affecting 7.6274 acres, was filed January 3, 1945. In both of these suits the prayer was for a judgment granting the Government the same rights and interests which had been conveyed by the lease, which rights were set out in the petitions; and the final orders of the court adjudging the nature of the interests and rights acquired by the Government in these condemnation suits specifically followed the terms of the lease in the enumeration of these interests and rights. In other words, and without question, the purpose and result of the condemnation was merely the acquisition by the Government by condemnation of the same rights embodied in the lease.

Among the rights acquired by the Government in condemnation are those set forth in paragraph 7 of the lease (hereinbefore quoted) and which are specifically and in exact language embodied in the order of the court setting forth the interest acquired by the condemnation. Without repeating in exact language the provisions of the lease (par. 7) or the corresponding provision of the condemnation orders, it is pointed out that there was granted a right

in the Government to erect structures on the land and to make any improvements thereon, including walks, driveways, utilities and roads, with the provision that all such structures and improvements, *except walks, service driveways, underground utilities and roads* should remain the property of the Government and might be removed by it from the premises at the expiration of the use of the property by the Government. And that after termination of its use the Government was not required to do any restoration work of any sort but might leave the premises in such condition as existed after it had removed any improvements as it might elect to remove.

Since taking possession of the property in 1944 the Government has erected numerous dwelling houses thereon, has built streets and sidewalks, installed sewer and water lines, manholes, fire hydrants and such other appurtenances as were necessary to the creation of a housing area.

Although seemingly the original intention of the Government was to utilize the property for a temporary period in connection with the war effort, it made no move to discontinue its use after the war ended. On the contrary, in October, 1947, it decided to acquire the fee simple to the entire 28.7663 acres and the present proceeding in condemnation was instituted for that purpose. The question in controversy now before the court arises in this present action and involves the amount of compensation awarded the landowners for the fee in the land by the commissioners designated to make such award and the manner in which the compensation was arrived at.

After the commissioners were appointed, pursuant to the provisions of Section 4366 et seq. of the Code of Virginia, they held a hearing on October 18, 1948, at which counsel for both the Government and the landowners were present and at which evidence was introduced by both parties upon the question of value. The situation as to estimation of value was an unusual one and presented certain difficulties, due to the fact that the Government was already in possession, and to the terms upon which that possession was held. These terms, it will be remembered, provided that the Government, upon terminating its use of the land, had a right to remove all structures and improvements *except roads, driveways, walks and underground utilities.* These excepted items were to remain upon the land. Of course the Government had not removed anything from the land at the time it sought to obtain the fee. It was clear also that the landowners had no title or interest in the houses and other items which, under the lease, remained the property of the Government and which it had a right to remove; and that the value of these could not properly enter into such compensation as the landowners were entitled to.

In their appearance before the Commission counsel seem to have been in agreement as to the basis on which the Commission should proceed in determining the value of the fee. This was that the property should be considered in the state it would be if it had been cleared of all houses and other items which the Government, under the lease, had a right to remove, while leaving thereon all roads, walks, underground utilities etc. which, under the lease, became the property of the landowners.

This viewpoint is set forth in the opening statement of counsel for the Government in his appearance before the Commission, from which the following excerpts are taken:

"There was a lease entered into between the Government and the landowners, involving this property, which was renewable from year to year. The Government then proceeded to improve the property in various ways, such as building roadways, putting in pipe lines and so forth, and then certain housing projects were placed on the land.

\*    \*    \*    \*    \*    \*

"Among other things, paragraph 7 of the lease provided the following—and this will also be of interest to you and will be one of your guides in determining the value of what the Government is taking at this time. Before reading paragraph 7, I might state this, that by agreement between the landowners and the Govern-

ment, the Government was allowed to put certain houses on this property with the understanding that at any time the lease was terminated the Government had the right to remove those houses and then leave the land in the condition that it would be found after the removal of the houses. In other words the Government is not required and was not required to improve the property or to fill up the holes or to do any grading after the removal of the houses. Everything has been paid for except the land itself. On the other hand at the termination of the lease for any reason the landowners got certain benefits, and that is controlled by this paragraph 7 that I am going to read you now (He then read paragraph 7 to the Commission, and continued).

\* \* \* \* \* \*

"So the thing that you are to determine at this time, and today, is the value of the land as you see it with a visualization on your part of the houses being removed. In other words, if the Government went out there this week and removed all of the houses, then next week if you were looking at the property, what do you think would be a fair payment for the land that is being taken."

The record shows that counsel then clarified the foregoing statement to the extent of stating that the valuation should be fixed as of October 23, 1947, the date on which the proceeding was instituted. It appears that counsel for the landowners, in his statement to the Commission, agreed with the basis of valuation as outlined by Government counsel, saying in part: "He (Government counsel) has also properly told you that the landowners get the benefit, if any, of the walks, service driveways, roads, the underground utilities—that would be water-lines and sewer-lines and appurtenances—so that you assess the valuation as if there were no buildings on the land, but the land were just in the condition it would be if they had actually moved the buildings on the 23d. of October, 1947, and had left the roads and the service driveways and the underground utilities and their appurtenances."

It is seen, therefore, that the parties were in agreement that the property should be valued on a basis which included as a part thereof all improvements, except those which the Government had the right to remove. In other words it was to be valued as a subdivision with roads, driveways, walks, water and sewer lines constructed and installed, but with no buildings thereon. And in the introduction of evidence as to value both sides adhered to this theory. Without going into the details of this evidence it may be said that the Government presented the testimony of two witnesses who had inspected and appraised the property and who fixed its value at $73,122.00. They also fixed $2,000.00 as severance damages, i. e., damages to adjacent property not taken. From this total they deducted $10,000.00 which they estimated as the expense to which the landowners would have been put to restore the property if the Government had in fact removed the buildings as it had a right to do under the lease, but which expense the landowners were saved from incurring by the taking of the fee. This left a net valuation for the fee of $65,122.00. Testimony of four or five witnesses was introduced by the landowners and most of these estimated the value at approximately $150,000.00. The commissioners in making their award fixed a valuation of $114,250.00 for the land taken and $12,875.00 for damages to the residue, making a total compensation to the landowners of $127,125.00.

We come now to the matter of controversy presented for decision. Following the report of the Commission the Government filed exceptions thereto, setting forth as its grounds:

1. That the amount of the award was excessive; (2) That the commissioners failed to consider the fact that at the time of the taking the Government had a lease on the property with the right of renewal from year to year during the War Emergency and for three years thereafter; (3) That this right of use under the lease was of value and that its value should have been deducted from the fair market value of the property; (4) That the Commission

applied improper methods of valuation of the improvements placed on the land.

In its brief arguing in support of its exceptions the Government does not attempt to define or discuss what is intended by grounds 2 and 3, but limits itself to ground No. 4, stating in regard thereto: "Specifically, the objection is that the commissioners arrived at their valuation of $114,250.00 by assuming that on October 23, 1947, the date of the taking, the Government's right to the use and occupancy had terminated; that all of the buildings had been removed from the land, but that all walks, service driveways, roads, sewer lines and water lines constructed by the Government remained in place on that date, and that the landowners were entitled to compensation based on the value of the land on that date, as enhanced by the aforementioned improvements."

The argument then states as "Questions to be Determined", the following:

1. Where a governmental agency possessing the power of eminent domain is in possession of land under a lease or order of court providing for the exclusive use and occupancy thereof, and has constructed improvements thereon, institutes a proceeding to condemn the land in fee simple, before its right of occupancy has expired, is the enhancement in the value of the land by reason of such improvements a proper element to be included in determining the just compensation to which the owners are entitled?

2. Assuming the Commissioners' award has been predicated upon an error as to the law, may the court properly set aside such award?

3. Assuming that the Commissioners' award has been predicated upon an error as to the law and may properly be set aside, is the agreement by counsel for the Government and the landowners, that the latter should have the benefit of the improvements constructed by the Government, binding upon the court, thus making it improper to set aside the award in the present case?

It is apparent that the exceptions to the Commissioners' report represent a sharp reversal of the position taken throughout the hearing before the Commission. The exceptions now denounce as an improper basis of valuation the very same basis which the Government laid before the Commission as the proper one and in conformity with which it introduced its evidence. What has caused this reversal of position is not apparent, nor need it be inquired into. In substance the Government is now asserting that the basis of valuation which it advocated before the Commission as a proper one, and upon which the Commission acted, was, in fact, erroneous; and asks the court to hold that the Government is not now estopped to attack the award on that ground.

The primary issue in the case is embodied in the first of the three questions propounded in the Government's brief and heretofore quoted. On examination of this, however, we find that it does not fully or accurately represent the situation here. It omits a very important condition, namely, that, by the terms of the lease when entered into, the improvements constructed on the land became the property of the landowners and that this was affirmed by the judgment of the court in the proceedings wherein the Government acquired by condemnation the same rights and obligations embodied in the lease. With this condition added and under the circumstances existing here, I am of opinion that the answer to this first question must be in the affirmative.

This right of the landowners to the improvements was not one which the Government could revoke or extinguish whenever it might choose. It was a consideration for the right to use the property and an essential condition to its use. It seems plain that the money payment of $1,100.00 a year was nominal for a tract of this size and value, and particularly in view of the conditions of the use. It is to be remembered that the Government could have terminated its use at any time on 60 days' notice and could have removed its buildings with no obligation to do any work of restoration. It could have left the land dotted with houseless foundations rising above the surface, with open holes from abandoned

basements, and any other debris it chose to leave. The Government's own witnesses estimated that, with the houses removed, it would cost $10,000.00 to restore the property to decent shape. Surely no one would lease property for $1,100.00 a year with the knowledge that at any time after 60 days the lease might be ended leaving the lessor with this expense of restoration.

A condition, and the primary one, on which the Government obtained the use of this property was its agreement that when it terminated its lease the improvements installed by it would become the property of the landowners; that the land would revert to the owners with a value enhanced by the improvements made upon it. Having so agreed it cannot repudiate that agreement nor evade it by now seeking to acquire the fee at a figure based on a valuation of the land without the improvements. It appears to be the argument of the Government that, since the right of occupancy had not expired at the time this proceeding was instituted, no right in the improvements had accrued to the landowners and that they are not entitled to their value. To adopt this view would lead to manifestly unjust results in a case of this sort. Under this view the Government could occupy and use land under a lease for a number of years and then, by the expedient of condemning the fee, could escape any payment for its use during the leased period.

I think the true and realistic intendment and effect of the agreement between the parties is that from the time the lease was entered into, the landowners became vested with a fixed interest in any improvements (of the sort here in question) which might be placed thereon by the Government. This interest was subject to the Government's use of the improvements during the period of the lease, but became vested in fee in the landowners whenever the leasehold estate ended. Nor do I think it makes any difference whether the lease was ended by abandonment of the property or by the course now being pursued, namely, the acquisition of the fee in the property. Either course effectually ended the leasehold estate and gave rise to the landowners'

rights to the improvements. A simple illustration shows why this should be so. Suppose that the lease had been terminated on a certain date by notice, as provided in it. In such event the improvements would, under the agreement, immediately become the property of the landowners. If then a week later the Government should seek to condemn the fee in the property, could there be any doubt that the value of the improvements would be an element in the compensation properly awarded the owners? I see no difference in principle, nor should there be any difference in effect, because the Government acquired the fee without first terminating the lease by notice.

Or, to illustrate again, suppose the property had been under lease to a private person on the same conditions embodied in this lease, and the Government had undertaken to condemn it in fee. Could it be questioned that the proper valuation would be for the land as it stood with the roads, walks, driveways, utilities existing thereon? The situation is not changed by the fact that the Government and not a private party happened to have been the original lessee. Broadly stated the basis of valuation in condemnation is the fair market value at the time of taking. When the fee in this property was taken it consisted of a tract divided for residential purposes with roads, walks and utilities permanently installed. It makes no difference that these improvements had previously been installed by the condemnor when the very condition of their installation was that they were to revert, with the land, to the ownership of the landowners. The measure of compensation was the fair market value of the property as it stood at the time of taking and the fact that it was improved, and the extent and nature of the improvements, entered into its market value at that time. If the Government had abandoned the property and some other authority possessing the power of eminent domain were now condemning the fee in it, undoubtedly the condemnor would have to pay for the property as it now stands improved. The Government has no greater right. The object of an award is to com-

pensate the owner for what he has lost. If these owners are not to be paid for the value of the improvements, which, by the Government's specific agreement are theirs and in consideration for which the Government obtained the use of the property, then they are not fairly compensated for what has been taken from them. I think that counsel for the Government was right the first time, and that the basis of valuation upon which the Commission acted was a proper one.

Counsel for the Government now urges that "if the Commissioners' award is allowed to stand the government is placed in the ridiculous position of having to pay not only for the land taken but also for the improvements placed on the land by the United States for the use of the United States". A brief answer to this argument is that it ignores entirely the obligation which the Government undertook with respect to the improvements when it entered into the lease. No doubt had the Government acquired the fee in this tract in 1944, when it was unimproved, the cost of it would have been much less than it is now required to pay. But instead it decided to lease the land under a contract whereby, in consideration for its use, it enhanced the value of the property. Having now at this later time decided to acquire the absolute title to the property, it is not "ridiculous" nor is it unjust that it should pay its present value. The net result of the manner in which the Government has dealt with this property since 1944 has no doubt entailed an expense which could have been avoided if the fee had been taken in the first place. But it is not the first instance where the improvidence and lack of foresight of governmental agencies have resulted in uselessly large expenditures.

An examination of the cases cited by Government counsel to support its present contention shows that none of them are applicable to the present case. So far as any of them present a situation where a temporary use under lease or otherwise was followed by condemnation of the fee, they show in each instance that the condemnor had, under his leasehold, specifically reserved ownership of any improvements placed on the land and the right to remove them. See Old Dominion Land Co. v. U. S., 269 U. S. 55, 46 S.Ct. 39, 70 L.Ed. 162; U. S. v. Smith, D.C., 110 F. 338, both cited by the Government. This is a situation directly contrary to that here, where, by the terms of the lease and as consideration for it, the improvements are specifically made the property of the landowner.

■ In view of the foregoing expression of opinion little need be said as to the problems which the Government advances in its questions 2 and 3. As to the first of these it may be said that as a general proposition the court has the right and duty to set aside the award of a commission where it is clear that it was arrived at through applying erroneous principles of law. In my opinion no such error was committed here. Question 3 really involves the proposition of how far the Government is bound by the acts of its agents and attorneys in the course of a lawsuit and whether it is estopped to question them. This requires no answer here because of my previously expressed opinion that the award was not predicated on any error as to the law.

■■ On the basis on which the Commissioners fixed the valuation nothing appears which would justify the court in holding that the award is excessive. The tendency of the law in Virginia (and elsewhere) is to give great weight to the findings of Commissioners in condemnation cases and to hold that the opinion of these men who have examined the property and registered their sound judgment as to its value should not be set aside except for a good cause clearly shown. The general rule is that the report of Commissioners will not be interfered with except where it reasonably appears that the Commission was influenced by prejudice or corruption or is shown to have acted under a clear misconception of fact or of law. Nothing in the record indicates any of these things.

■ It is true that there was a wide disparity in the estimates of the value of the property as between witnesses for the Government and those for the landowners.

But this is usual in such cases. It is also true that the award made was decidedly larger than the value estimated by the Government. But it was also considerably smaller than the valuation which the landowners claimed. This also is a frequent occurrence and indicates that the Commissioners rightly declined to be bound by the estimates of either of the conflicting parties and exercised their own judgment which resulted in a valuation somewhere between the customary depreciated valuation of the condemnor and the exaggerated valuation of the owners. There appears no ground for setting the award aside and the exceptions to the Commissioners' report will be overruled.