**UNITED STATES of America, Petitioner-Plaintiff,**

v.

**CERTAIN LAND IN the BOROUGH OF MANHATTAN, CITY, COUNTY AND STATE OF NEW YORK, and 306 Broadway Corp., et al., Defendants.**

United States District Court
S. D. New York.

May 21, 1964.

On the Merits Aug. 5, 1964.

Supplemental Opinion Aug. 6, 1964.

Harry T. Dolan, Sp. Asst. to the Atty. Gen., for petitioner.

Palmer, Masia & Palmer, Fuchsberg & Fuchsberg, Raphael, Searles & Vischi, Romano & Schenker, Samuel Goldstein & Sons, Melvin Lloyd Robbins, New York City, Archibald Palmer, Jacob Fuchsberg, Sidney Z. Searles, Anthony Romano, Samuel Goldstein, New York City, of counsel, for defendants.

TENNEY, District Judge.

By orders to show cause, the owners and tenants of certain tracts of land and buildings thereon taken in the above-entitled proceeding, requested that the pro forma order, dated April 30, 1964, of the Honorable Charles M. Metzner, United States District Judge, vesting title to the lands in the Declaration of Taking filed herein, be amended to stay the United States of America and/or the General Services Administration from evicting the owners of said land pending the trial of the issues.

Although certain of the movants originally requested that the pro forma order of Judge Metzner be vacated and set aside, contentions made by them that the taking in this proceeding was not for a public purpose have since been withdrawn.

The said pro forma order did not fix any time within which the parties in possession were to surrender possession, but decreed that title to the lands described in the Declaration of Taking become vested in the United States of America on April 30, 1964, and that the Government was, on that date, "entitled to immediate possession thereof." On May 2, 1964, the General Services Administration sent to the parties in possession, including certain of the movants herein, a request that they vacate by midnight, May 9, 1964, and that failing to do so, it would "be necessary for the United States of America to take appropriate action through the Court or otherwise to have the premises vacated."

The basis for the request was stated to be that the "condition of the buildings presents a potential danger to persons

and property occupying the premises" and that the Government intended to demolish the buildings as soon as possible and proceed with work on the excavation and foundation work for the U. S. Customs Court and Federal Office Building on the adjacent property.

No proceedings have been instituted as yet under Rule 70 of the Federal Rules of Civil Procedure to enforce the Government's right of immediate possession.

■ Accordingly, the within applications are construed by the Court as constituting petitions for equitable relief by the amendment of the ex parte order "to fix the time within which and the terms upon which the parties in possession shall be required to surrender possession." 46 Stat. 1421 (1931), 40 U.S.C. § 258a (1952).

It seems clear that the Court has such power under the above-cited statute and that this is true even though the time and terms may not have been fixed at the time of the issuance of the ex parte order. United States v. Certain Interests in Property, etc., 302 F.2d 201, 203 (2d Cir. 1962).

■ Furthermore, in the exercise of the power to "fix the date for possession" there is a duty imposed on the Court "to see that such date for possession * * * [is] in accordance with the equities." United States v. 6576.27 Acres of Land, etc., 77 F.Supp. 244, 246 (D.N.D.1948).

■ However, "[O]nce it is administratively determined that a property is to be taken for a public use, a United States court ordinarily will not review the reasonableness of the government's decision as to the time of taking or the period which must elapse before the property is utilized solely for a public activity." United States v. Certain Parcels of Land in City of Philadelphia, 215 F.2d 140, 147 (3d Cir. 1954).

■ Moreover, it is the opinion of the Court that its power to review is limited to those cases where there has been a clear abuse of administrative discretion and where the government officials in making an administrative decision have acted "in bad faith" or "so capriciously and arbitrarily" that their action was without adequate determining principle or was unreasoned. United States v. Carmack, 329 U.S. 230, 243, 67 S.Ct. 252, 91 L.Ed. 209 (1946). See also, United States v. State of New York, 160 F.2d 479, 480 (2d Cir.), cert. denied, 331 U.S. 832, 67 S.Ct. 1512, 91 L.Ed. 1846 (1947).

While the authorities cited for this proposition involved primarily the extent, amount or title of the property to be taken, the Court believes the same principle must be applied to a determination of the time of taking actual possession. Cf. United States v. 6576.27 Acres of Land, supra.

The Court has carefully examined the affidavits of the architects and engineers submitted by the Government and by movants relative to the condition of the buildings involved. There is no dispute that there has been settlement and lateral movement with respect to four of the buildings involved, and that there was a continuation of both lateral and vertical movement from April 22, 1964, when pile driving and construction work was stopped on the adjacent property, until May 3, 1964. The Government expert's opinion, and that of his associates and consultants is "that the present condition of the buildings west of the construction site presents a possible hazard of life, limb and property" and that "this is true even if no further construction work is undertaken." The experts for movants do not dispute that there has been lateral and vertical movement, but it is urged that only four buildings are affected, or that no danger exists "while no further excavation and foundation work goes on, on the adjoining property", or that the condition can be remedied by shoring and other methods.

The Court has the fullest sympathy for the tenants who have been directed to vacate these premises. For many of them, forced to move out on such short notice, heavy financial loss, not to mention extreme inconvenience may well result. Various suggestions have been

made to the Court, both at the hearing which this Court conducted and in the moving papers, which the Government may wish to consider so as to alleviate as far as possible the pecuniary loss and inconvenience to movants and others similarly situated. However, in a case such as this, where not only administrative action but the public safety is involved, the Court should not attempt to substitute its judgment for that of the parties responsible. Clearly, on the evidence, there were and are substantial grounds to support the position of the Government herein.

Accordingly, the motions to amend the pro forma order of April 30, 1964, are denied.

So ordered.

## On Remand.

The within proceeding is one for the acquisition of certain land for public use pursuant to the provisions of Title 40, Section 258a of the United States Code (1952). A complaint was filed by the Government on April 30, 1964. On that date, a Declaration of Taking was filed, pursuant to Section 258a, and there was deposited, in the Registry of this Court, the estimated just compensation of $3,-512,051.00 for the land and improvements to be acquired. Thereupon, and on April 30, 1964, a pro forma order was entered herein by the Honorable Charles M. Metzner, United States District Judge, vesting title to the said lands in the United States of America, and decreeing that "the United States of America is entitled to the immediate possession thereof."

On May 2, 1964, the General Services Administration sent to the parties in possession, including certain of the movants herein, a request that they vacate by midnight, May 9, 1964, and that failing to do so, it would "be necessary for the United States of America to take appropriate action through the Court or otherwise to have the premises vacated." The basis for the request was stated to be that the "condition of the buildings presents a potential danger to persons and property occupying the premises" and that the Government intended to demolish the buildings in order to proceed with work on the United States Customs Court and Federal Office Building on the adjacent property.

Thereafter, by Orders to Show Cause, the owners and tenants of certain tracts of land and buildings thereon so taken, requested that the said pro forma order of April 30, 1964, be amended to stay the United States of America and/or the General Services Administration from taking possession pending the trial of the issues.

This Court, in a memorandum opinion filed herein on May 21, 1964, denied the motions to amend the said pro forma order of April 30, 1964, from which decision movants filed appeals. On June 2, 1964, 332 F.2d 679, the United States Court of Appeals for the Second Circuit, in an opinion dated that date, remanded the case to this Court to "proceed with all speed to hear and examine such expert witnesses as the parties concerned may wish to call, and also any public officers or employees who are concerned with the public safety and condition of buildings." This Court was further directed to "inquire into what, if any, undertakings or other means of assurance may be feasible to save harmless the government, and any contractors or other interested parties, with respect to claims arising out of continued occupancy of the premises, so that such continued occupancy may be conditioned on terms reasonable to the government, including payments in lieu of rent for the period since April 30 and for any period during which the court may permit continued occupancy by any of the tenants."

■ In compliance with the mandate of the Circuit Court, this Court has held hearings and has carefully considered the affidavits filed herein to determine the date when the land and improvements thereon should be vacated, and to fix the terms and conditions of continued occupancy. This Court has taken no evidence on the matter of compensation to the Government for occupancy since

April 30, 1964, as both petitioner and those in possession have requested, for the sake of convenience, that such determination be made by the District Judge hearing the matter of the compensation to be paid herein as awards for the lands and improvements acquired.

In determining whether the pro forma order of April 30, 1964, should be amended to fix a specific date when possession by the Government should be allowed, the Court has considered not only what danger may exist by reason of delay in demolishing the buildings, but also the fact that, as stated by the Circuit Court, "the occupants are entirely without fault in this matter and are entitled to have any reasonable doubt decided in their favor consistent with the public safety."

There are eleven (11) parcels involved herein which have, or, subsequent to April 30, 1964, had tenants or were owner-occupied. These parcels may be considered in two groups: (a) those which form the property between Duane and Pearl Streets and which extend west from the property presently under construction for the Federal Office Building to Broadway—namely, 306, 308, 310, 312, 314–18 Broadway, 551–555 Pearl Street and 79–81 and 83–85 Duane Street; and (b) those which form the property between Pearl Street and Worth Street and which extend west from the Federal Office Building property to Broadway—namely, 320, 326–30–32, and 334 Broadway. (326–30–32 and 334 Broadway are sometimes referred to hereinafter as "98 Worth Street", and includes premises known as 552 Pearl Street.)

The first group of parcels above mentioned, namely, those between Duane and Pearl Streets, do not present the same problems inherent in the group between Pearl and Worth Streets. In the first place, whatever danger exists as to this first group arises from the condition of 320 Broadway to their north. Two of the parcels in the first group have been completely vacated, viz., 551–555 Pearl Street (a parking lot) and 79–81 Duane Street (a synagogue). Of the remaining parcels in this group: 306 Broadway is a five-story building 80 percent vacant as of July 31, 1964; 308 Broadway is a one-story building owner-occupied by a liquor store; 310 Broadway is a five-story building owner-occupied by a men's clothing store; 312 Broadway is a five- and two-story building owner-occupied by an electronics store; 314–318 Broadway is a two-story building with only approximately 46 percent of the space occupied by four tenants; and 83–85 Duane Street is a five-story building owner-occupied by an office-furniture dealer.

The second group, namely, the parcels between Pearl and Worth Streets, presents more serious problems due to dangerous conditions alleged to exist in 320 Broadway, and to a lesser degree in the 98 Worth Street parcels. 320 Broadway is a sixteen-story office building which formerly housed some 100 tenants occupying 110,000 net square feet of space. On July 31, 1964, 75 of the tenants occupying 89,422 net square feet of space had vacated, leaving only 25 tenants occupying some 18 percent of the total space previously occupied. The great majority of those continuing to occupy space are attorneys with offices in the top seven or eight stories. The 98 Worth Street parcels, i. e., 326–30–32 Broadway and 334 Broadway, are five stories in height. The tenants on the fourth and fifth floors have either already vacated or are in the process of moving. Of an original total of 9 tenants occupying some 125,770 net square feet of space at 326–30–32 Broadway, 3 tenants occupying some 37,775 net square feet have vacated, leaving 6 tenants occupying 70 percent of the total space previously occupied. Of an original total of 4 tenants occupying some 2,000 net square feet of space at 334 Broadway, only 1 tenant occupying some 200 net square feet of space has vacated, leaving 3 tenants occupying 90 percent of the total space previously occupied. The owner-occupant of these 98 Worth Street parcels is Addressing Machine & Equipment Co., Inc., occupying the second floor at

326–330 Broadway and also certain basement areas in that property.

A determination by the Court of the question of the inherent safety or danger of a complex structure such as a sixteen-story office building, even with the aid of expert testimony, is a difficult one, to say the least. Although no structural plans were furnished the Court, assuming there are any still in existence, the following information relative to the structure was developed at the trial.

320 Broadway (also known as 320–324 Broadway) was erected around 1896 on a steel framework and is sixteen stories in height. There is a footing or grillage, sitting on a brick extension, which supports the columns and steel framing of the structure. There is no evidence of piles under the building—in fact, the new building application of 1896 indicates that the building is supported on sand. The steel structure supports the floors, but the exterior walls are not carried by the steel structure itself but by beams along the facade and, floor by floor, the load is carried by the columns to the foundation. Thus, the exterior wall is a free-standing wall, for all practical purposes, with the building having the composite support of end-bearing walls and some forty (40) columns coming down to a footing—typical of construction in the 1890's. The east wall of the building, with which we are primarily concerned, is of brick, tapered in from the property line. Testimony as to the thickness of this wall at the base ranged from 2 feet 8 inches to 3 feet 6 inches, and at the roof-top from 12 inches to 18 inches. There are two light-courts on the north side of the building, across each of which at the upper stories there are three "tie rods" of one-quarter inch metal, two stories apart. These ties were either installed during the original construction or shortly thereafter when some distress in the building may have been noted. These ties are not attached to steel girders but are connected to the brick wall by a steel plate on the inside and bolts from the plate to the ties on the outside.

Construction work on the Federal Office Building and Customs Court site to the east of 320 Broadway commenced in April of 1963, and in June of 1963 elevations and lateral lines were established by land surveyors on 98 Worth Street and 79 Duane Street. However, it was not until October of 1963 that marks to determine vertical movement were established on 320 Broadway. This was done along the southern or Pearl Street side of the building, running all the way from the southwest to the southeast corners at level elevation. First measurements of settlement were commenced late in October but the first settlement was not discovered until around December 17, 1963. Thereafter and until May 3, 1964, settlement was recorded on repeated observations in increments of one-sixteenth of an inch, and in some cases as much as one-eighth of an inch, at which time total settlement had reached a maximum of one and fifteen-sixteenths of an inch. Additional vertical movement or settlement of one-sixteenth of an inch occurred between May 3d and June 10th, apparently taking place between May 28th and June 10th in nine individual column locations in the northeast corner of the basement. On June 15th, a further settlement of one-sixteenth of an inch was discovered, but only at two locations—again in the northeast corner of the basement. The Court received word of a further settlement of one-sixteenth of an inch on July 28th. It would appear from the foregoing that there has been a total settlement at 320 Broadway of over two inches since December of 1963.

As to lateral movement, it appears undisputed that there had been substantial lateral shifting many years prior to the commencement of construction of the Federal Office Building and Customs Court House. A survey of 326 Broadway (98 Worth Street) in 1911 indicates that the abutting easterly wall of 320 Broadway leaned two and one-quarter inches to the east at that time. There is some indication, although of questionable probative value, that this had increased to three inches by 1919. Lateral moni-

toring of the east wall of 320 Broadway started on January 2, 1964, at which time, taking a check from the southeast corner of the sixteenth floor to the fifth floor (roof of 98 Worth Street), a plumbness of three inches, more or less, to the east was recorded. This had increased to six and one-sixteenth inches on April 22, 1964; to six and three-sixteenth inches two days later, and to between six and one-quarter and six and one-half inches by April 27, 1964. A reading was also made on January 2, 1964, from the fifth floor to street level but not recorded. The witness who made the reading recalled that it was two inches, more or less, to the east. This could conceivably indicate an easterly plumbness from the sixteenth floor to street level of five inches, more or less, on January 2, 1964. Actual readings from the sixteenth floor to street level were recorded on April 27th when there was an easterly plumbness of seven and seven-sixteenth inches, and on May 3, 1964, when this had increased to seven and three-quarter inches. Whether measured from the sixteenth floor to the fifth floor or to street level, it seems evident that there was an eastward lateral movement of the southeast corner of between three and four inches during the four-month period from January 2 to May 3, 1964.

As already noted, there was a vertical movement of approximately two inches during this same period.

Similarly, during the period from April 22 to May 3, 1964, eastward lateral movement of one-quarter inch, more or less, was recorded in the middle and northeast corner of the east wall.

There has been no further lateral movement since May 3, 1964. All pile-driving and vibrating work was terminated at the adjoining construction site on April 22, 1964.

Other indications of deterioration of the building were noted as early as October of 1963 when a crack opened in the southeast corner of the seventh floor. It was at about this time that monitoring for vertical movement was commenced,

and the contractor requested permission of the owner of 320 Broadway to dig a test pit to determine the condition and type of foundation. Permission to dig the pit was not obtained until April 2, 1964. The new cracks in the building were principally in the southeast corner, running up the southeast columns from the seventh through the fourteenth or fifteenth floors, and in the southeast corner of the easternmost light-court on the north side of the building. These cracks, both vertical and diagonal, are from one-eighth to one-quarter inch in width. However, there has been no further widening of these cracks since construction on the adjoining site ceased.

A test pit in the basement of 320 Broadway and adjacent to the east wall was completed on April 15, 1964. The footings were found to be poor and supported on large timbers (14 x 14 inches) which had deteriorated due to the lowering of the ground water. No evidence of piles to support the building was found. Based on the condition uncovered and the vertical and lateral movements already referred to, pile-driving ceased. Actually, in August of 1963, the vibratory effects of the pile-driving had been felt beyond the property line and beyond where some underpinning of other buildings had been done. Thereafter, a sonic hammer was substituted for the steam or air hammer, without substantial improvement.

The Government called as its expert witnesses William H. Mueser, senior partner of the consulting engineers employed by the architect-engineers on the Federal Office Building and Customs Court House project and a specialist in building foundations and site and soil investigation; and Fred N. Severud, senior partner of the consultant engineering firm.

Mueser examined the test pit on April 17, 1964. He testified regarding the conditions of the footings and to the fact that the brick wall on the east tapered in from the property line so that any loads that came down on it were eccentric. In his opinion, the building had been mov-

ing, was very sensitive, and any further movement or extraneous activity "would make it tend towards collapsing." However, when he was later recalled to the witness stand he indicated that, in view of the fact that there had been no lateral movement during the past eight or nine weeks, the building "was coming to rest" and that, in the absence of further work on the adjoining site or other external forces, it might remain in its present condition for an indefinite period. He still, however, considered it a hazard. If a collapse occurred, he believed it would be the east wall that would go, but that in falling it might shatter some of the walls on the north and south sections, too. Although Mueser testified with respect to the foundation conditions and generally as to the structure, movements and cracks, his concern was primarily with the soil conditions and with the unusual compaction that had occurred. He viewed any danger to the building as arising from an external force.

Severud's concern, however, was with internal forces within the structure itself—forces which might be released without any further movement or without the application of any external force.

Severud, a specialist in structural engineering, was engaged as consultant in this field by the architect-engineers in 1962, and on April 15, 1964, was consulted by them relative to the physical condition of 320 Broadway, which building he thereafter inspected "from top to bottom." He testified that the pattern of the cracks, the most noticeable of which on Pearl Street were three-quarters of an inch wide, showed that part of the north and south return walls connecting the east wall with the building had partly separated from the building, and that the east wall, which weighed approximately five million pounds, was exerting a dead load of five tons per square foot delivered to a footing that was eccentric, i. e., where the footing extends only on one side of the wall. The Building Code specifies a maximum of two tons per square foot, including dead and live load, on this type of soil. He further pointed out that the footings were partly wood and partly concrete and that the wood had deteriorated.

According to Severud, the physical settlement that had taken place would introduce horizontal forces between the east wall and the other walls, and also between the east wall and the interior framing. He testified that there was a fairly definite piece of the east wall that was trying to free itself from the rest of the building. This tendency was being resisted by the following factors: the ties, the general framing, and 98 Worth Street. The ties, however, in his opinion, were under severe stress because the building had moved out towards the east, and if the ties or struts should tear out of the masonry, or if any of the anchorages had been rusted out so that the anchors would break, this would release dynamic forces.

There is a hazard, he believed, to the steel framework because of the connection of the steel beams to the east wall. With a drastic difference in level between one support and the other, a great amount of tension had built up which could be released at any time. With a normal settlement tolerance of one-half inch, the total was already around two inches. Although the east wall of 320 Broadway "leans" heavily on 98 Worth Street, the latter structure, even if it were braced, was never designed for lateral force of this magnitude. Accordingly, Severud believed that external hazards are not as great as the internal ones, although an external force might trigger the release of the inner forces. He admitted that there had been no deterioration of the brickwork where the ties attached, but noted that there were cracks in the neighboring wall. He could not say whether the ties or steel girders were in a deteriorated condition. He admitted that no cracks have appeared in the east wall itself during the past year, but that deterioration had taken place at the southeast end of the wall on Pearl Street and that there had been a cracking in the northeast wall in

the corner of the east light-court. He further agreed that the cracks had not widened as pile-driving was discontinued on April 22, 1964. In his opinion, a hazardous condition existed.

Thomas V. Burke, Borough Superintendent of Manhattan, New York City Department of Buildings, was called as a witness on behalf of certain of the tenants regarding 320 Broadway and other buildings involved herein. He testified that he had last examined the buildings around the middle of May 1964, and that 320 Broadway was safe at that time. He did not feel that a one-sixteenth-inch vertical movement was substantial "of itself"—however, "added to other increments it might." Noting that he no longer inspected the building, since the Government now had jurisdiction, he indicated that if it were under his jurisdiction "we would maintain a constant watch" and that if this were a private job the "Building Department would have stopped the construction some time ago to require underpinning of 320 Broadway." He further testified that if pile-driving were resumed, it was quite probable that vertical and lateral movement would increase to a dangerous point, requiring the demolition of the building "before it fell down." He stated that his Department was being furnished with all reports of further lateral or vertical movement.

From the foregoing testimony and the exhibits herein, I believe that there is one fact that stands out among all others, and that is that the condition of 320 Broadway will not permit the resumption of pile-driving or other heavy work on the construction site until that building is demolished either totally or at least down to the fifth floor. I further believe that the building represents a substantial hazard even in the absence of a resumption of such work. Here is a building, portions of which are moving counter-clockwise, which is gradually settling to the east. It is true that we are speaking in terms of inches and fractions of inches, but the slant of the east wall, regardless of the pre-existing plumbness

eastward, has at least doubled over the period from January 2 to May 3, 1964. I am mindful of the fact that there has only been a settlement of one-sixteenth of an inch between May 3, and June 5, 1964; a further settlement of one-sixteenth of an inch on June 15th (at only two of some dozen locations where settlement previously occurred) and a further settlement on July 28th at certain locations. Also that there has been no further vertical movement or widening or reopening of cracks in the building. I have also considered the unquestionable inconvenience, personal and financial, to the tenants of this building. I was not unaware of this when I originally refused to modify the pro forma order. Although the risk is great, and the decision one which I respectfully submit more properly rests with the administrative branch of government, I believe that the maximum time during which 320 Broadway should remain occupied and open to the public should expire on September 1, 1964.

From the testimony herein I am satisfied that no pile-driving or heavy vibratory work will be resumed on the adjoining site to the east until the hazard of 320 Broadway has been removed. I have been further informed that daily readings of possible vertical or lateral movements are being made, and reports of any such movements are to be furnished to the Department of Buildings and to the Court. In my opinion, the internal stresses still exist. It is in this light that I have reached my decision as to the date on which 320 Broadway is to be evacuated.

Passing now to the other buildings where the question of deferred possession by the Government is in issue, 98 Worth Street presents problems different from those relating to the buildings in the area between Duane and Pearl Streets. Here there was early evidence of settling at the southeast corner, due possibly in part to underpinning done in July of 1963. Elevations were established in June of 1963 with bench marks at Worth and Centre Streets and at

Duane and Elk Streets. A total settlement of two inches was recorded between June 26, 1963 and May 3, 1964, with no settlement recorded between April 22, 1964 and May 3, 1964. An additional one-sixteenth-inch settlement was recorded on June 15, 1964, on the fire-wall where the northeast corner of 320 Broadway joins 98 Worth Street, and again on July 28th. This corresponded to the one-sixteenth-inch settlement of 320 Broadway measured on those dates. There has been very little lateral movement measured—fifteen-sixteenths of an inch easterly movement during the period from June 26, 1963 to May 3, 1964, with one-eighth inch occurring during the period from April 22, 1964 to May 3, 1964. However, braces and jacks have been maintained under 98 Worth Street since it was underpinned. Pre-test piles were installed and I-beams with steel wedges placed between the piles and the foundation. These wedges are maintained by tapping to make sure they are tight. Jacking is also done to be sure the load is on the pile. Several loose wedges have been found, indicating some instability. In addition, the rear wall was braced with steel H-columns and spur braces, and portions of the rear wall of the superstructure were tied back to the building by means of steel tie-rods and steel channels. At the northeast corner of the building tie-rods with wood runners were installed to prevent spalling of face brick

There was originally a gap between 320 Broadway and the portion of 98 Worth Street known as 552 Pearl Street, but this is now filled in, due to the movement of 320 Broadway. As long as 320 Broadway remains standing there is a two-fold risk to 98 Worth Street; first, that the lateral force imposed by 320 Broadway will cause 98 Worth Street to collapse, and, second, that 320 Broadway will itself collapse on top of 98 Worth Street. With the removal of 320 Broadway, much of the danger to 98 Worth Street will have been eliminated. Furthermore, with the elimination of 320 Broadway, all danger to the buildings on Broadway between Duane and Pearl Streets will also be removed.

The structure at 312 Broadway comprises two portions. The main structure has five stories with basement and sub-basement extension. This extension has settled and rotated toward the east. Total settlement from September 30, 1963 to May 3, 1964 was two inches, of which three-eighths of an inch occurred during the period from April 22, 1964 through May 3, 1964. Total lateral movement during the same periods has been one and three-eighth inches east and one-quarter inch east, respectively. No further lateral or vertical movements have been reported at 312 Broadway. The rear wall of the extension has been underpinned. In addition, three H-columns have been driven tight against the rear wall. These columns have in turn been spur-braced with structural steel members and hydraulic jacks with pressure gauges showing the pressure at all times. An inspection of the main building has shown no evidence of damage due to settlement or lateral motion.

I conclude, in the light of the foregoing, that upon the delivery of possession of 320 Broadway, possession of the remaining properties by the Government can be deferred until November 1, 1964, and it is so ordered. There has been testimony to the effect that 320 Broadway can be demolished without vacating the remaining properties, except possibly for that portion of 98 Worth Street known as 552 Pearl Street, and the owner had indicated willingness to vacate these premises if necessary. It may be that certain of the occupants of the remaining properties can and will surrender possession prior to November 1st. In any event, postponement and deferment of possession by the Government until the dates hereinbefore fixed shall be upon the following terms and conditions:

1. That the former owners, or tenants of the former owners, who are permitted to remain in possession of said buildings, or any space therein, shall pay all costs incident to repairs, maintenance, utilities, upkeep, water

and sewer charges, operation or servicing of said structures from April 30, 1964 until such time as possession is, in fact, surrendered to the Government and, upon surrender of such possession, the occupants shall deliver possession in as good physical condition as the buildings were at the time of taking by the Government on April 30, 1964, ordinary wear and tear excepted.

2. That as a condition for retention of possession for any deferred period, the said occupants, whether former owners or tenants of former owners of each building, shall undertake to procure and maintain, at their own cost and expense, liability insurance in amount of $100,000. for single injuries and $500,000. for group injuries and any property damage in amount of not less than $50,000. and with such companies as shall be approved by the Government and the Court. The policies evidencing such insurance, to be approved by the Government and the Court, shall name the Government as the assured and shall be delivered to the Government. In case of an accident or injury to persons or property, the said former owners, or their tenants, in such deferred possession structures, shall promptly notify the Government in writing of any accident, fire or damage occurring in said premises.

3. The said occupants of said deferred possession structures shall also procure adequate fire and windstorm insurance in amounts comparable to the insurance coverage on April 30, 1964 and shall name the Government as the assured and sole beneficiary thereof.

4. The said occupants in such deferred possession buildings shall comply with all regulations of New York City under laws, or ordinances thereof, in respect to the condition of the premises and the use thereof, during such deferred possession period.

5. At all times during the deferred possession period, the Government, or its authorized representatives, or agents, shall have the right to enter upon the property at any time for inspection thereof and for any purpose necessary or desirable by the Government in connection with its plans of demolition and/or preparation of plans and specifications for future use of said buildings, and/or land upon which said buildings are located.

6. The former owners, or tenants of said former owners, who have occupancy of any of the buildings or land involved in this condemnation action, since the date of taking on April 30, 1964, shall be liable to pay to the Government just compensation for use of such buildings and land, or space therein, from April 30, 1964 to the date of actual surrender of possession to the Government. The date of surrender of possession shall be the subject of a written notice from the occupants to the Government of the date of such surrender of possession or proposed surrender of possession and verified as to actual surrender of possession by the Government or its representatives. The compensation required to be paid for such use and occupancy shall be fixed and determined in the action, after trial, in the event that the amount is not the subject of agreement between the Government and the said occupants.

7. The right of any of said occupants to remain in possession under the order of this Court shall not be the subject of assignment, transfer or sublease to any person, firm or corporation.

8. It is further provided that any and all compensation required to be paid to the Government by any former owners or tenants for the period from April 30, 1964 to the date of actual surrender of possession, unless agreed to by the Government with such occupants and paid pursuant to such agreement, shall be fixed and determined in this action. United States v. Certain Interests in Property in the Borough

of Brooklyn, 302 F.2d 201 (2d Cir. 1962).

9. In addition to the expenses, for which the former owners or tenants of the former owners, who are permitted to remain in possession of said buildings or any space therein, shall be required to pay under Paragraph 1 above, they shall also undertake and be solely responsible for the operation and servicing of said buildings and the space therein from and after the date possession is deferred and until the actual surrender of possession.

10. The said tenants of the former owners, who are permitted to remain in possession of said buildings or any space therein, shall furnish adequate security to be approved by the Court, for payment of all costs, expenses or compensation required to be paid hereunder.

11. The foregoing terms and conditions shall be subject to amendment and modification in particular instances only upon the express consent of the Government through the General Services Administration, and with the approval of the Court.

12. The Government shall advise the Court of any further vertical or lateral movement of 320 Broadway.

Settle order in conformity herewith.

### SUPPLEMENTAL OPINION

On the same date that the opinion herein (dated August 4, 1964) was filed, viz., August 5, 1964, the Court was informed by the General Services Administration of further vertical movement in the wall and supporting pillars at 320 Broadway.

This settlement amounted to one-sixteenth of an inch at eight (8) points, and to as much as one-eighth of an inch at four (4) points.

The Court took further testimony from Mr. Severud and Mr. Mueser, and on the basis of their testimony and the prior testimony heard herein, the Court is of the opinion that possession by the Government for the purpose of demolishing this building should not be further delayed.

Accordingly, the prior opinion hereinbefore referred to is amended to provide that the date on which possession of 320 Broadway shall be surrendered to the Government is August 6, 1964.

So ordered.