**UNITED STATES of America,**
**Plaintiff,**

v.

**121 ACRES OF LAND, MORE OR LESS, IN the COUNTY OF MARIN, STATE OF CALIFORNIA, Jack H. Stockstill et al., and Unknown Owners, Defendants.**

**No. 44465.**

United States District Court
N. D. California.
Feb. 1, 1967.

Rodney Hamblin, Asst. U. S. Atty., San Francisco, Cal., for plaintiff.

Freitas, Allen, McCarthy & Bettini, San Rafael, Cal., for defendants Mc-Carthy, Bettini, MacMahon & Allen.

Robert D. Barbagelata, San Francisco, Cal., for defendants Jack and Lillian Stockstill.

Douglas J. Maloney, County Counsel, San Rafael, Cal., for defendant Marin County.

Rockwell, Fulkerson & Clarke, San Rafael, Cal., for defendants Jordan and Dorothy Dell'Era.

C. Ray Robinson, Merced, Cal., for defendants Hulstedt and Marshall.

David R. Baty, San Rafael, Cal., in pro. per.

## MEMORANDUM OF DECISION

SWEIGERT, District Judge.

This is a condemnation suit filed by the United States against 121 acres of land, more or less, in the County of

Marin, naming defendants Bettini, McCarthy, MacMahon, Allen, Marshall and Baty as owners of Parcel 2 (58 acres) and the defendant Stockstill as owner of Parcel 3 (30 acres).

At the time of filing, December 6, 1965, a Declaration of Taking was filed by the Solicitor for the United States Department of Interior with deposits of $90,000 for Parcel 2 and $52,600 for Parcel 3. The estate taken was the fee simple thereof excepting certain water right easements.

The purpose of the taking was for use in connection with the establishment of the Point Reyes National Seashore of the National Park Service of the Department of the Interior under the provisions of an Act of Congress of September 13, 1962, Public Law 87–657, 76 Stat. 538.

Answers were filed by the defendant Baty in propria persona; also by defendants McCarthy, Bettini, MacMahon and Allen through counsel; also by defendant Stockstill through counsel.

The case is now before the Court upon the government's motion to strike certain defenses which will be hereinafter mentioned.

The case is also before the Court upon the government's motion for judgment on the pleadings as to certain other defenses which will be hereafter mentioned.

Finally, defendants set up a further defense that the Act of September 13, 1962, does not authorize the taking of these Parcels 2 and 3, or the taking of the fee thereof or the amount of land taken. This latter defense is the subject of the government's further pending motion for a partial summary judgment.

After the filing of the pending government motions the defendants countered with motions for summary judgment of dismissal of the government's suit.

## STATUTORY AUTHORIZATION FOR THE TAKING OF PARCELS 2 AND 3

We take up now what appears to be the main issue raised by both the government and the defendants on their respective motions for summary judgment.

The owners of Parcels 2 and 3 contend that the taking of these parcels was not within the authority granted to the Secretary of the Interior by the Act of September 13, 1962. The government contends that the taking was so authorized.

The Act of September 13, 1962, an Act to establish the Point Reyes National Seashore in the State of California and for other purposes, authorizes the Secretary of the Interior to take appropriate action toward establishment of the National Seashore set forth in Section 2 of the Act.

Section 2(a) then provides that the area of this National Seashore is "described as follows by reference to that certain boundary map, designated NS–PR 7001, dated June 1, 1960, on file with the Director, National Park Service, Washington, District of Columbia" Section 2(a) then follows with a metes and bounds description of this National Seashore area.

The map referred to shows in black boundaries the area to be taken as a National Seashore. It also shows certain adjacent areas not taken for the seashore area proper—except that there is a black line through that adjacent area indicated as an "Access Corridor".

Section 2(b) of the Act then separately provides: "The area referred to in subsection (a) shall include also a right-of-way, to be selected by the Secretary, of not more than 400 feet in width to the aforesaid tract from the intersection of Sir Francis Drake Boulevard and Haggerty Gulch."

The map shows this right of way (Access Corridor) as running from what appears to be the intersection of Sir Francis Drake Boulevard, Drake's Summit Road and Haggerty Gulch, thence generally southerly, straight and parallel to dotted lines lettered as "Haggerty Gulch" to a point on the northerly boundary line of the seashore area proper.

Parcels 2 and 3, the subject of the pending motions, have been taken not for

the seashore area proper, but for the right of way provided by Section 2(b), plus certain adjacent landlocked area.

Parcels 2 and 3 are described in the complaint and in the Declaration of Taking as including portions of the 400 foot access road as selected by the Secretary, and also certain adjacent land which will be landlocked between the right of way and the seashore boundary as a result of the selection of this particular route.

In support of its motion for partial summary judgment the United States has filed (5/10/66) an affidavit of Thomas Kornelis, Department of the Interior, to which are attached three maps—one of them an aerial photograph.

The Kornelis affidavit states that the taking of the 400 foot right of way has landlocked all of the Bettini and Stockstill land situate uphill from the location of the proposed road which lies between the proposed access road and the north easterly boundary of the National Seashore proper.

The only affidavit filed by any defendant is that of Bettini (6/8/66) "in answer to affidavit of Thomas Kornelis"—an affidavit to which reference will hereinafter be made.

■■ In United States ex rel. Tennessee Valley Authority v. Welch, 327 U.S. 546, 552, 66 S.Ct. 715, 718, 90 L. Ed. 843 (1945) the Court pointed out that, whatever may be the scope of the judicial power to determine what is "a public use" in 14th Amendment controversies the decision of the Congress "is entitled to deference until it is shown to involve an impossibility"; that, although it is a general rule that powers to condemn are subject to strict construction, it is the function of Congress to decide what type of taking is for a public use and the agency authorized to do the taking may do so to the full extent of its statutory authority.

That the taking of an Access Corridor from a main highway for land approach to a National Seashore is a public use is not disputed by defendants. Their objections are to the route and direction of the Access Corridor Road selected by the Secretary.

If, however, the selection of the route and direction of the road was within the statutory authority conferred by the Act of September 13, 1962, the only possible remaining question would be whether the exercise of that authority was arbitrary, capricious or in bad faith. (See Southern Pacific Land Co. v. United States, 367 F.2d 161 (9th Cir. 1966).

We now consider, therefore, whether the route, as selected by the Secretary, was within the authority granted by the Act of September 13, 1962.

Admittedly, the proposed right of way (Access Corridor) as selected by the Secretary, does not follow the route roughly shown on map of June 1, 1960, No. NS–PR–7001, referred to in the Act. That map, however, is referred to in the Act only with respect to the metes and bounds description of the seashore area proper as set forth in Section 2(a). It is not mentioned in Section 2(b) which deals separately with the access corridor to be selected outside the seashore area proper. Although the map shows the Access Corridor, neither Section 2(b), nor the Act as a whole, relates the right of way (as distinguished from the seashore area proper) to this map.

Unlike Section 2(a), which gives a metes and bounds description of the seashore area proper, Section 2(b), dealing with the right of way, neither refers to the map nor sets forth metes and bounds description for the right of way.

That the Act was designedly so framed in this respect is evident from the fact that the right of way (Access Corridor) was "to be selected by the Secretary".

In any event, it would be unreasonable to interpret the Act as binding the Secretary to a map the scale of which is 24,000 feet (nearly 5 miles) to 2¼ inches. The map could not possibly show detail—only a rough approximation of this Access Corridor.

■ We conclude that the evident intent of the Congress in its reference to the map was only to exemplify mapwise

the area of the seashore proper as described by metes and bounds in Section 2(a); that it was not the intent to bind the Secretary to this map in the selection of the outside Access Corridor.

We must, therefore, look primarily to the terms of Section 2(b), rather than to the map, to ascertain the authorization intended by Congress to be given to the Secretary for the selection and taking of the right of way.

Section 2(b) states in effect that there is to be a right of way *"to be selected by the Secretary,* of not more than 400 feet in width *to* the aforesaid tract" (i. e., the National Seashore proper) *"from* the intersection of Sir Francis Drake Boulevard and Haggerty Gulch." (emphasis added).

This was obviously necessary to provide some way of land access to the northerly boundary of the National Seashore from Sir Francis Drake Boulevard —the main route by which the public can reach the general area of the National Seashore from public highways.

It should be noted that Section 2(b) indicates *only the point of origination* of the right of way, i. e., the intersection of Sir Francis Drake Boulevard and Haggerty Gulch.

Section 2(b) does not delineate the route or direction of this right of way (Access Corridor) from that stated intersection. The section states only that the right of way will be *"to* the aforesaid tract [i. e., the National Seashore proper] *from* the intersection of Sir Francis Drake Boulevard and Haggerty Gulch." (emphasis added)

So far as Section 2(b) is concerned, the route or direction of the right of way *from* such stated intersection *to* the seashore boundary is left entirely to the selection of the Secretary of the Interior. Conceivably, it could be routed from that indicated intersection by any route— straight, meandering or otherwise—that would eventually bring it *to* the seashore area at any selected point on the seashore boundary line.

Certainly, there is nothing in Section 2(b) which requires that the route or direction of the right of way shall be in or along or even near Haggerty Gulch except, of course, at its stated point of origination at the Haggerty Gulch and Sir Francis Drake intersection.

The route or direction of the right of way from the stated intersection could, therefore, be through Parcels 2 and 3, or any other part of the area adjacent to the park, on its way to some point on the northerly boundary of the park.

Although there may be some justification for the contention that anyone reading or relying upon Section 2(b) might have reasonably assumed that the right of way would *originate* at the intersection of Sir Francis Drake Boulevard and Haggerty Gulch, no one reading 2(b) could safely or reasonably have assumed that the *route* of the right of way would take any particular course between that stated intersection and the northerly boundary of the National Seashore.

The only question raised by a reading of Section 2(b) is whether the Secretary of the Interior is required to *originate* the right of way precisely at the indicated intersection of Haggerty Gulch and Sir Francis Drake Boulevard.

██ Even if Section 2(b) is so construed, such construction would be of little consequence to defendants if the Secretary could route the right of way from that stated point in any direction he might select—including a direction that might take it through or near defendants' Parcels 2 and 3. We have already noted that under Section 2(b) the Secretary could do just that.

██ In any event we are of the opinion that the stated point of origination of the right of way should be considered subordinately to the evident intent of Section 2(b) that the route between Sir Francis Drake Boulevard and the National Seashore boundaries should be "selected by the Secretary". So considered, it is our opinion that the right of way need not originate *precisely* at the inter-

section of Haggerty Gulch and Sir Francis Drake Boulevard—so long as the right of way selected runs substantially from the area of that intersection to some point on the northerly boundary of the National Seashore area.

Indeed, it appears from the aerial map (Ex. C of Kornelis affidavit) that there is no precise intersection of Haggerty Gulch and Sir Francis Drake Boulevard. That map indicates that the northerly end of Haggerty Gulch, although near the Boulevard, does not precisely intersect it.

Under these circumstances we conclude that the stated point of origination of the right of way should be interpreted as a guide to the Secretary in his selection of a northerly point of origination of the right of way as distinguished from a hard and fast limitation upon the evident, overriding intent of Section 2(b) to leave the selection of the access corridor between the Boulevard and the park to the selection of the Secretary.

■ So interpreted, Section 2(b) is a reasonable delegation of the selection of the access corridor to the Secretary under the evident guiding standard that it be an access corridor to connect the northern boundary of the seashore area with Sir Francis Drake Boulevard substantially in the vicinity of the Boulevard's so-called intersection with Haggerty Gulch.

The right of way route actually selected by the Secretary accomplishes the intended purpose well within the statutory authorization. Although its northerly point does not actually reach Sir Francis Drake Boulevard, it does reach it indirectly and substantially via the Bear Valley Road which does intersect the Boulevard at a point only a few hundred feet (approximately 400 to 1000 feet) from the intersection stated in Section 2(b). The right of way then runs southerly and irregularly from its connection with Bear Valley Road to an ultimate point at the seashore border near the top of Haggerty Gulch.

■ For the foregoing reasons we are of the opinion that the 400 foot right of way access corridor selected by the Secretary, including such portions of it as lies within Parcels 2 and 3, was within the authority granted by Section 2(b).

■ Defendants contend, however, that Section 2(b) authorized only the acquisition of an "easement" for a right of way purpose and that the taking of the fee estate of Parcels 1 and 2 for that purpose was unauthorized.

We are of the opinion that there is no merit to this contention. The term right of way, as used in Section 2(b) must be reasonably construed as referring to a strip of land—an "Access Corridor"—rather than as a term of limitation upon the kind of estate to be taken. See: Ogdens CALIFORNIA REAL PROPERTY LAW, § 13.6.2, at 500; 25 Am.Jur. (2) 422 (Sec. 8); United States v. Certain Parcels, 57 F.Supp. 486, 490 (W.D. La.1944).

Defendants also contend that the Act, limiting the width of the right of way to 400 feet, precludes the taking of any land beyond the prescribed width of the right of way and that the remaining portions of Parcels 2 and 3 could not be taken.

It is admitted that the route of the right of way, selected and taken by the Secretary through Parcels 2 and 3, is such as to landlock the remaining portions of Parcels 2 and 3 between the right of way and the seashore boundary.

Under these circumstances the question arises whether the Secretary, authorized to take the 400 foot right of way, could take other lands which, although not actually needed for the roadway, were landlocked as a result of the route selection.

It has been held that under a statute authorizing a federal agency to condemn all property deemed necessary for carrying out the purposes of the Act and providing further that the Act be liberally construed, the agency could take additional isolated land in order to relieve the state from restoring and maintaining

a public highway between a reservoir and the national park which had been flooded in the course of the building of a power dam by the agency. United States ex rel. Tennessee Valley Authority v. Welch, 327 U.S. 546, 66 S.Ct. 715, 90 L.Ed. 843 (1946).

Although the Act of September 13, 1962 is not expressly couched in such broad terms, neither does it contain any applicable provisions which might preclude implied authority to take such additional land as might be reasonably incidental to the taking of the 400 foot access corridor proper.

The only provision referring to the taking of access roads is that in Section 4 of the Act to the effect that in acquiring access roads "within the pastoral zone" the Secretary shall give due consideration to existing ranching and dairying uses and shall not unnecessarily interfere with or damage such use. It appears, however, from the map referred to in Section 4 that Parcels 2 and 3 are not in or near the pastoral zone.

In Polson Logging Co. v. United States, 160 F.2d 712, 716 (9th Cir. 1947) it was held that, under a statute authorizing the Secretary of Agriculture to construct roads outside of a national forest, the condemnation of an additional 100 acres of land as a source of gravel for maintenance and improvement of the roads outside the forest was within the authority of the Secretary and not improper as enlarging the boundaries of the forest since the Secretary, authorized to build and maintain the road, was empowered to acquire gravel land as incidental to the construction of the road.

In Southern Pacific Land Co. v. United States, supra, it was held that, under a statute authorizing condemnation for a naval air station, the taking by the agency of mineral rights, as well as the land, to protect the government by assuring advantageous liquidation of the government investment in the event of sale of the property was within the authority of the agency—absent a showing that the taking of the mineral rights was arbitrary, capricious or in bad faith.

■ In the pending case, if the Secretary had not taken the landlocked areas, he would have been faced with problems of the feasibility and cost of providing access from the otherwise landlocked land to the right of way. Under these circumstances we are of the opinion that the Secretary's decision to take the areas was incidental to the taking of the right of way and well within the authority of Section 2(b).

During the pendency of these motions and after hearing and submission on July 7, 1966, the Court was informed of the introduction by Senator Kuchel on August 25, 1966, of Senate Bill 1607 in the Congress to amend Section 2(b) of the Act of September 13, 1962. On October 15, 1966, this bill became law and is now designated as P.L. 89–666, 80 Stat. 919.

This amendatory law strikes subsection (b) of Section 2 of the Act of September 13, 1962 and substitutes therefor the following:

> "The area referred to in subsection (a) of this section shall also include a right-of-way to the aforesaid tract in the general vicinity of the northwesterly portion of the property known as 'Bear Valley Ranch', to be selected by the Secretary, of not more than four hundred feet in width, together with such adjoining lands as would be deprived of access by reason of the acquisition of such right-of-way."

Although the amendment does not state its purpose, an examination of its legislative history discloses that the purpose of the amendment was "simply to clarify the existing authority" conferred by Section 2(b) of the Act of September 13, 1962, "so as to remove any doubt which may exist with respect to the selected location". (Senator Kuchel's Senate Report of August 25, 1966). The Rivers Report to the House of September 22, 1966, U.S.Code Cong. & Admin. News 1966, p. 4066, also stated that the purpose is "to clarify a provision of the act authorizing the establishment of Point

Reyes with respect to the location of a right-of-way for an access road to the area."

The brief floor discussion indicates that members of the Congress had been advised that some land owners were contending in and out of Court that the access road had to follow a certain route different from the one indicated in the amendatory act; that there was no merit in this contention since the basic act merely fixed a terminus for the access road and did not describe a route; that if the park service were required to follow the route these landowners argue for, it would cost the taxpayer 2 to 3 millon dollars more than the other route.

This Court is of the opinion that this amendatory act could not be given retroactive effect to the date of taking the parcels here involved if by such retroactive application vested rights of the owners would be adversely affected.

Certainly, if the original Act of 1962 did not authorize the taking of the Parcels here involved, the owners of the property would have a vested right to object by appropriate legal defense to any taking of their property for a public purpose without such authority of law and to insist upon a new condemnation action and a new taking under the Act as amended.

However, it is not necessary to rely upon the amendatory Act. Our interpretation of the original Section 2(b) is to the effect that the proposed access road, as selected by the Secretary, including the taking of the fee of Parcels 2 and 3, was well within the legislative authority conferred by the Act of September 13, 1962.

## WHETHER ANY ISSUES OF FACT REMAIN EXCEPT THE ISSUE OF COMPENSATION FOR THE TAKING OF PARCELS 2 AND 3

Having concluded that the taking of Parcels 2 and 3 was within the authority granted to the Secretary by Section 2(b) in its original form, we now examine the record to determine whether there is anything in the record that might preclude partial summary judgment in favor of the government as to all issues—except the issue of compensation for the taking of Parcels 2 and 3.

The Court has in mind Southern Pacific Land Co. v. United States, supra, wherein the Court held that, although as a general rule the administrative decision as to the necessity for taking particular property or property interest is not subject to judicial review, there is a possibility of judicial review where the administrative decision to condemn a particular property or property interest is alleged to be arbitrary, capricious or in bad faith.

The answers on file herein raise various defenses to the government's action, e. g., (1) that the land taken is unnecessary and in excess of the government's requirements; (2) that the taking is not compatible with the public interest and least private injury; (3) that the taking constituted an abuse of discretion and bad faith on the part of government officials; (4) that the failure of the government to take all of defendants' land bars the taking; (5) that another route for the access road is more economical and convenient; (6) that the Act of September 13, 1962, is unconstitutional.

However, as provided by Rule 56(g) F.R.Civ.P., an adverse party on motion for summary judgment may not rest upon the mere allegations or denials of his pleading but his response, by affidavits or otherwise, must set forth specific facts showing that there is a genuine issue for trial.

After examination of the pleadings and the affidavits on file, particularly the affidavit of defendant Bettini of 6/8/66, we are convinced that there is no genuine issue as to any material fact and that plaintiff is entitled to judgment as a matter of law—except with respect to the issue of the amount of compensation to which the defendants are entitled for their respective Parcels.

The Bettini affidavit includes Exhibit I (the map of 6/1/60, NS–PR–7001), Exhibit II (an obviously self-serving letter of 6/8/65 from Attorney Allen, representing defendants, to Kornelis, Department of Interior) and Ex-

hibit III and IV (other National Park Service maps of the proposed seashore area).

The Bettini affidavit states in substance and effect that the taking of the 400 foot right of way, as selected by the Secretary, will landlock portions of Parcels 2 and 3 only "if the Secretary of the Interior exceeds its authority and condemns or acquires interests in adjoining lands, namely, direct access rights to the proposed roadway, and thereafter fails to provide substitute ingress and egress to the property * * *." This allegation would be material only if the assumption upon which it is based, i. e., lack of authority to take the fee of Parcels 2 and 3, were correct. We have held to the contrary.

The affidavit then states that the maps attached to the Kornelis affidavit are "incomplete and misleading" because the map of June 1, 1960, NS–PR–7001 is "omitted from Exhibit A" of the Kornelis affidavit. We have, however, considered this map in our interpretation of the Act of September 13, 1962.

Considered in the light of our conclusion that the Secretary's decision to take Parcels 2 and 3 was authorized, we find no allegation of any specific facts in the pleadings or in the Bettini affidavit sufficient to raise a genuine issue of fact concerning any alleged arbitrariness, capriciousness or bad faith in the exercise of that authority or concerning any other material fact.

Since the above mentioned defenses raise either issues of law or issues of fact which the Court, assuming valid statutory authorization exercised reasonably and in good faith, could not inquire into, there is nothing to preclude partial summary judgment.

The motion of the government for a partial summary judgment as to all issues except the amount of compensation or damages to which defendants are entitled should therefore be granted.

Plaintiff will prepare a formal order in accordance with these views and as required by Rule 56(d) F.R.Civ.P.