UNITED STATES of America upon the relation and for the Use of the TEN-NESSEE VALLEY AUTHORITY, Plaintiff,

v.

THREE TRACTS OF LAND CONTAINING A TOTAL OF 1,174 ACRES MORE OR LESS, IN JACKSON COUNTY, ALABAMA, et al., Defendants.

Civ. A. No. 72–462–NE.

United States District Court,
N. D. Alabama,
Northeastern Division.

Feb. 13, 1974.

Beauchamp E. Brogan, Assoc. Gen. Counsel, Knoxville, Tenn., argued, Robert H. Marquis, Gen. Counsel TVA, and Justin M. Schwamm, Knoxville, Tenn., on the brief, for plaintiff.

Julian D. Butler, Butler & Potter, Huntsville, Ala., Wm. E. Garner, pro se, for defendants.

## MEMORANDUM OPINION

McFADDEN, Chief Judge.

This is a condemnation proceeding by the Tennessee Valley Authority (hereafter "TVA") to condemn the respondents' land as a part of an inventory of sites for electric generating plants. TVA has filed its declaration of taking to which the landowners have interposed multiple objections. The objections in essence are:

(1) The taking is not for a public use in that TVA does not have the statutory or constitutional authority to condemn the property to be used exclusively for the production of electric power to be sold by TVA;

(2) That the plaintiff has not complied with the National Environmental Policy Act of 1969.

The matter is before the Court on the motion of the Tennessee Valley Authority to strike the defenses and for summary judgment.

Defendants contend that the use to which the plaintiff seeks to put the property is not a public use as authorized by the Tennessee Valley Authority Act. Specifically they contend that the TVA Act and the United States Constitution does not authorize the condemnation of land for building of an electric generating plant to be used exclusively for the production of electric power to be sold by TVA.

The land was condemned as a part of an inventory of sites for the future construction of electric generating plants and it is most likely that it was under consideration at the time of condemnation for the building of a nuclear plant since all of TVA's advance planning is geared toward that concept. TVA contends that the acquisition of the site as a part of an inventory is necessary to insure its ability to carry out its functions.

■ What constitutes a public use should be determined in the first instance by the legislature, but the legislative determination is always reviewable by the courts who bear the ultimate responsibility for the decision. See 29A C.J.S. Eminent Domain § 30 (1965). However, there is a strong presumption in favor of the correctness of the legislative determination. These principles are acknowledged in the leading case of U. S. ex rel. TVA v. Welch, 327 U.S. 546, 66 S.Ct. 715, 90 L.Ed. 843 (1946). Justice Black's majority opinion in that case emphasized Congress' function to determine what is a public use and went on to say:

> . . . whatever may be the scope of the judicial power to determine what is a "public use" in Fourteenth Amendment controversies, this Court has said that when Congress has spoken on this subject "Its decision is entitled to deference until it is shown to involve an impossibility." [Cite omitted.] Any departure from this judicial restraint would result in courts deciding on what is and [what] is not a governmental function and in their invalidating legislation on the basis of their view on that question at the moment of decision, a practice which has proved impracticable in other fields.

327 U.S., at 552.

■ It appears therefore that this Court does have authority to and should review the question of public use, but the scope of its review should be constrained by a deference to the statutory intent of the TVA Act.

Section 4(i) of the TVA Act, 16 U.S.C. § 831c(i) provides that TVA:

> Shall have power to acquire real estate for the construction of dams, reservoirs, transmission ' lines, power houses, and other structures . . . and to condemn all property that it deems necessary for carrying out the purposes of this Act . . .

A clear inference that the term "power houses and other structures" was intended by Congress to include steam plants is found in the express statutory authorization to issue bonds for the construction of steam plants. 16 U.S.C. § 831n. A district court in Tennessee held that a mere reading of 16 U.S.C. § 831c(i) is convincing evidence of Congressional authorization for TVA to build a steam plant. Rainbow Realty Company v. TVA, 124 F.Supp. 436 (M.D.Tenn. 1954); accord U. S. ex rel. TVA v. Easement and Right of Way, Logan Co., Ky., 246 F.Supp. 263 (W.D.Ky.1965), aff'd 375 F.2d 120 (6th Cir. 1967).

The proposed nuclear electric generating plant will be a steam plant as opposed to an electric generating plant whose turbines are turned by water power. Nowhere does the Act infer contemplation of a particular type of steam plant whether oil-fired, coal-fired, or nuclear reactor-fired. Clearly, the nuclear plant will be a steam plant and clearly TVA is authorized to construct steam plants.

Defendants contend nevertheless that under 16 U.S.C. § 831h–1 which authorizes TVA to build electric generating plants at dams to use the power to support its own operations and to sell any surplus electric power to avoid waste and help liquidate the maintenance cost of the Authority clearly contemplates the building of electric generating plants only in conjunction with the hydro-electric plants. This section of the Act seems clearly to say that TVA should build dams for the primary purpose of controlling loads and navigation and not

for the sole purpose of building hydro-electric plants to sell power; but this section places no restriction other than by indirect reference on the lawful purposes for which steam plants may be built. Rather, 16 U.S.C. § 831n and § 831n–4, indicate that steam plants are to be constructed by TVA when they become necessary to discharge TVA's broad responsibilities for the advancement of the national defense and the physical, social and economic development of the area and Congress further intends that TVA should provide an ample supply of electric power for such purposes. 16 U.S.C. § 831n–4(h). The cases cited above, Rainbow Realty Company v. TVA and U.S. ex rel. TVA v. Easement Right of Way, Logan Co., Ky., although deciding controversies over rights of way for transmission lines, addressed the issue of the legality of steam plants whose output would be fed through these lines and held that such steam plants were authorized where they were planned and operated as part of TVA's integral network of electric power distribution. It would appear that the plant to be built on this site if one is built there would be a part of TVA's overall electrical network and that clearly TVA is authorized to build it.

It further appears to the Court that TVA would be authorized to build the plant even if it was to be used solely for the production of electricity for sale to others. A review of the history of TVA and the development of the Act clearly shows an intention on the part of Congress for TVA to fill a utility role that is not merely the sale of surplus power as a by product to its main function. Congress, in 1939, amended the Act to authorize the issuance of bonds to finance the acquisition of generating and transmission facilities of private utilities.

. . . At the time this amendment was passed, Congress understood that TVA was assuming a utility responsibility for the area and that eventually it would be necessary to build steam plants to carry out that responsibility.

United States ex rel. v. Easement Right of Way, Logan Co., Ky., *supra* (246 F. Supp. 263, 267). There is no showing that the proposed plant would be used exclusively for the production of electricity for sale to others, but under the broad powers given to the TVA this Court would conclude that TVA would have the authority to do so.

Defendants contend that the construction and operation by TVA of a large electric generating power plant to be used exclusively for the production of electricity for sale to others is unconstitutional even if authorized by the statute. It is their contention that Ashwander et al. v. TVA et al, 297 U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688 (1936), restricted its holding to approving the constitutionality of building Wilson Dam as a valid exercise by Congress of its power to control navigation and provide for the national defense and the sale of electric power from the dam as a valid secondary purpose to this constitutional primary purpose. It is defendants' contention that all subsequent cases regarding the constitutionality of TVA have limited their holdings to approving activities that could be tied directly to the operation of dams on the Tennessee River. Defendants rely on the inference that the proposed power plant would be unconstitutional because it would not be related directly to TVA's dam-building powers.

The Court has reviewed the cases cited by defendants and is unpersuaded that there is any lack of constitutional authority for the proposed action by TVA. Rather, the cases demonstrate several constitutional bases.

In Rainbow Realty Company v. TVA, *supra*, the plaintiff instituted an action for declaratory judgment and injunctive relief against the institution of condemnation proceedings by TVA to take property for electric transmission lines. The Court held:

. . . Boiled down, the main complaint of the plaintiff realty company is that the power system of T. V. A.,

which was in the beginning predominantly hydro-electric, is being converted through construction of many steam-generating plants to a predominantly "steam-power" system; and that T. V. A. lacks statutory or constitutional authority for the construction and operation of such a system, or for the construction of transmission lines for marketing the output of such system.

124 F.Supp., at 438. The Court went on to say:

> There can now be no doubt that there is plainly both constitutional and statutory authority for the acquisition by T. V. A., by eminent domain, of easements and rights-of-way for the erection of transmission lines to carry hydro-electric power. As has been shown, the Congress has lawfully appropriated money for the construction of "standby" or "firming-up" steam plants as auxiliary to hydro-electric T. V. A. plants. Transmission lines serving Nashville, Tennessee, which will include the line to be erected across the property of the Rainbow Realty Company, are part of a single integrated system of transmission connecting all the hydro-electric power plants of T. V. A. together with its steam plants and points of intersection with other utility systems. All these lines, including those over the property of plaintiff, will transmit some hydro-electric energy. We think it clear under principles enunciated in a connected series of Supreme Court opinions that the construction of these transmission lines cannot be held unconstitutional merely because such lines carry steam-generated electricity in addition to hydro-electric power.

> . . .

> . . . These cases establish the proposition that the *interstate commerce* clause of the Federal Constitution, Article I, § 8, clause 3, authorizes the development of integrated watershed programs. It, therefore, seems unnecessary in this case to ad-

vert to the effect of the war powers under the Constitution, the property clause, or the general welfare clause.

124 F.Supp., at 440.

In U.S. ex rel. TVA v. Easement and Right of Way, Logan Co., Ky., *supra*, the district court had rendered a judgment fixing the compensation amount in a TVA condemnation proceeding. The Sixth Circuit had affirmed the amount but the case was remanded to the district court for a determination of facts and law governing TVA's right to take the land in the first place. The district court upheld TVA's authority here:

> TVA's Paradise Steam Plant and the transmission lines connecting it with the TVA system are parts of an integrated system of multipurpose dams, steam plants, and transmission lines, which together improve navigation, help control floods, produce power, and serve generally to develop the Tennessee River watershed and are authorized by the commerce clause of the Constitution [citations omitted]; make a substantial contribution to the defense needs of the nation and are authorized under the war power and defense clauses of the Constitution [citations omitted]; and promote the development of the resources of the area served by TVA power and the general welfare of such area and of the nation as a whole and are authorized under the general welfare clause of the Constitution [citations omitted].

246 F.Supp., at 270. The Court thus appears to have gone much further than previous decisions in declaring the several constitutional grounds supporting TVA steam plants and other facilities.

■ It is the Court's opinion that the construction of a nuclear powered steam plant is authorized by the TVA Act and that the authorization is not in violation of the United States Constitution. It is the Court's opinion therefore that the TVA had the right to take the property as an inventory of sites for the construction of steam plants whether nuclear-fired or otherwise.

Defendants further contend that the taking is invalid because of the failure of TVA to comply with the Environmental Protection Act and file an environmental impact statement prior to the taking.

The Court is presented with the narrow issue: whether there is "a major Federal action significantly affecting the quality of the human environment" present in the condemnation of property by the TVA for an inventory of sites for electric generating plants, which thus requires the preparation of a NEPA environmental impact statement. This decision does not call into question the ultimate propriety of any final administrative determination. What is involved is the question of the imposition of certain conditions precedent required by the Act to any such decision. See Sierra Club v. Morton, 5 Environ. Rptr. Cases 1734, 1735 (D. D.C. Aug. 24, 1973).

The National Environmental Policy Act of 1969, 42 U.S.C. § 4321 et seq., requires of all federal agencies responsible and responsive consideration of the possible environmental consequences of their actions. The Act, in establishing environmental protection as a high priority of each agency, makes it the "continuing" responsibility of the federal government to "use all practical means and measures" in carrying out the national policy of restoring and maintaining environmental quality. 42 U.S.C. § 4331(a), (b).

Section 102 of the Act, 42 U.S.C. § 4332, prescribes certain procedural measures to insure that the substantive provisions of the Act receive the attention they deserve:

Sec. 102. The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter and (2) all agencies of the Federal Government shall

(A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and decisionmaking which may have an impact on man's environment;

(B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce en-

vironmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;

(D) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources. . . .

The purpose of imposing the § 102 procedural requirements on each federal agency is twofold. First, it aids the agency in its own decisionmaking process and advises other interested agencies, and the public, of the environmental consequences of the agency's planned action. Second, it provides evidence that the decisionmaking process has in fact taken place and allows those removed from the initial process to evaluate and balance the costs and benefits for themselves. Natural Resources Defense Council, Inc. v. Grant, 341 F.Supp. 356, 364 (E.D.N.C.1972); see also, Calvert Cliffs' Coord. Com. v. United States A. E. Com'n., 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971).

■ The scope of NEPA is very broad, compelling automatic consideration on all types of environmental values. However, the proposed federal action must come under the operative provisions of the Act. To be subject to the procedural mandate of Section 102 and thus require the preparation of an environmental impact statement and require a careful and informed decisionmaking process with judicially enforceable duties, the action taken by the TVA in selecting and condemning this and other property for and as a part of an inventory for sites for electric generating plants must constitute "major Federal action . . . significantly affecting the quality of the human environment."

Section 102(2)(C), 42 U.S.C. § 4332(2)(C).

A "major Federal action" has been described by one court as federal action which requires substantial planning, time, resources, or expenditure. Natural Resources Defense Council, Inc. v. Grant, *supra*.

The TVA did not prepare a NEPA statement prior to the decision to condemn the land as a part of an inventory of sites. It made an affirmative decision that the mere acquisition of the inventory was not a major federal action significantly affecting the environment.[1] This action by the agency is the question for review by this Court. The standard to be applied is one of reasonableness under the mandate of the statute.

The Court of Appeals for the Tenth Circuit in Wyoming Outdoor Coordinating Council v. Butz, 484 F.2d 1244, 1249 (10th Cir. 1973), stated the rule as follows:

Of course, there must be a determination whether the statute applies and some area of judgment is involved. However, we are convinced that the compass of the judgment to be made is narrow and that the determination must be reasonable in the light of the mandatory requirements and high standards set by the statute. See Save Our Ten Acres v. Kreger, 472 F.2d 463, 465 (5th Cir.); . . .

■ The Court is of the opinion that the mere acquisition of the title to the land without more would not require compliance with NEPA. While it is true that the contemplated use was for a nuclear generating plant, that decision was not necessarily coupled to the taking since it was not certain it would be used for a nuclear plant or for any steam plant. The Court is also of the opinion that even if it was so coupled, it would not require a different result. The character of use is not changed by the

---

1. TVA subsequently made a determination to use the site for a nuclear plant and caused an environmental impact statement to be prepared.

**638**

mere taking and in the Court's opinion the decision of TVA that the acquisition of title by condemnation was not a major Federal action significantly affecting the quality of human environment was reasonable under the circumstances and the Court holds therefore that an environmental impact statement was not necessary before condemnation. It is the Court's opinion that TVA was authorized to take the land as an inventory of sites for possible use in carrying out its functions without the necessity of complying with NEPA at that stage. The validity of the taking is the only matter before the Court and since the Court has determined that no statement was needed in order to take, it does not need to determine when the Act is triggered and an impact statement is required.

It is the Court's opinion therefore that none of the defenses to the taking by the defendant landowners are meritorious and that plaintiff's motion for summary judgment is due to be granted.